UNITED STATES of America, Plaintiff-Appellee,

v.

Bonnie Burnette ERWIN, Maranetta Martin Smith, Tarenthia Esmarelda Erwin, Joe Neal, Jr., Glenda Rochelle Lawton, Robyn Anderson Norman, Jo Carol Erwin, Grace Helen Davis, Diana Carroll Berry, Tyrell Defaris Erwin, and Don Wayne Erwin, Defendants-Appellants.

No. 85–1024.

United States Court of Appeals, Fifth Circuit.

July 3, 1986.

Nicholas W. Wright, Dallas, Tex., for BB Erwin.

Mark S. Werbner, Dallas, Tex., for Smith.

Kenneth S. Harter, Santa Barbara, Cal., for T.E. Erwin.

Tarenthia Esdmarelda Erwin, pro se.

T. Alan Owen, David A. Witts, Dallas, Tex., for Neal.

James H. Wallenstein, Dallas, Tex., for Lawton.

Robert T. Walls, Jr., Dallas, Tex., for Norman.

Anderson Wallace, Jr., Dallas, Tex., for T.C. Erwin.

Keith Marks, Irving, Tex., (Court-appointed), for Grace Davis & Tyrell Erwin.

R. Keith Walker, James E. Murphy, Dallas, Tex., (Court Appointed), for Diana Carroll Berry.

J. Glenn Turner, Jr., Dallas, Tex., Robin Norman, Gatesville, Tex., (Court Appointed), for D.W. Erwin.

James T. Jacks, Asst. U.S. Atty., Marvin Collins, U.S. Atty., Dallas, Tex., for U.S.

Before WISDOM, REAVLEY and JOHNSON, Circuit Judges.

REAVLEY, Circuit Judge:

Bonnie Erwin, Don Erwin, Jo Carol Erwin, Tyrell Erwin, Tarenthia Erwin,[1] Diana Berry, Joe Neal, Jr., Glenda Lawton, Maranetta Smith, Grace Davis and Robyn Norman appeal their convictions and/or sentences for various offenses relating to a drug conspiracy centered in South Dallas, Texas. We reverse all of the conspiracy convictions under Count 1, Don Erwin's racketeering conviction under Count 3, Jo Erwin's tax evasion convictions under Counts 26 through 29, and Grace Davis' perjury convictions under Counts 31 and 33. Otherwise, we affirm.

## BACKGROUND

### The Conspiracy

The indictment focuses mainly on the alleged activities and members of the "Erwin Organization," a multi-faceted criminal enterprise headed by Bonnie Erwin. Bonnie evidently entered the narcotics business sometime in the 1970's and expanded these activities in the early 1980's. Doubling as a legitimate watermelon farmer, he provided the brains, muscle and contacts for the Erwin Organization. Gradually, the Organization diversified, and encompassed the sale of cocaine to private customers and the passing of counterfeit fifty and hundred dollar bills.

The Organization operated as a loose family unit, with members adopting one another's names (or other aliases) for expediency or fellowship. Members included Bonnie's "family" (Robyn Norman and Tyrell, Tarenthia and Jo Erwin) and various young people from Tyler and Dallas, whom Bonnie promised to "take care of." Discipline was maintained within the ranks by occasional beatings, kidnappings, rumored solicitations of murder and one killing.[2]

Bonnie lived with Robyn Norman at a series of residences in Dallas and with Jo Erwin at a house on 29th Street in Tyler. Glenda Lawton followed Bonnie; most of the other members lived in fluid groups of three or four, selling pills out of a chain of

---

1. Because of the number of defendants named "Erwin," these appellants will hereafter be referred to by their first names.

2. Co-conspirator Rodney Baulkmon was allegedly whipped and Patrick Brooks was killed for stealing drugs. In addition, Leonard Johnson, a building contractor, was kidnapped, but he escaped.

"fortified"[3] apartments in South Dallas (often rented under assumed names), watching for police, storing and dispensing drugs from Bonnie's several homesteads or storage lockers, collecting profits, maintaining sales records, and traveling to California or Chicago for supplies.

To shelter his profits from the Internal Revenue Service (IRS), Bonnie began placing newly-purchased vehicles and other property in the names of "Erwin Produce," Organization members, neighbors and relatives, allegedly including Grace Davis, Bonnie's former sister-in-law. He also ran the Catfish Oasis, a fast-food restaurant in Tyler; drug money was purportedly laundered through that business and its video games.

Bonnie's younger brother, Don, operated another, separate South Dallas drug business. Patterned after Bonnie's, Don's group also lived in fortified apartments from which pills were sold. Don recruited his own personnel although a few of Don's workers moved over to Bonnie's larger, more profitable organization. Bonnie acted as Don's principal drug supplier; Don also bought elsewhere.

### The Indictment

Beginning in mid-1981, police periodically raided the brothers' fortified apartments. Some raids were preceded by "buys." Don and two workers were caught in one raid; Bonnie's daughter, Tarenthia, in another; Bonnie's son, Tyrell, in three—once with his wife, Diana Berry, and twice with other co-workers; Glenda Lawton in one and Joe Neal in one. All except Neal received light sentences in state court; Neal served some time in state prison. Bonnie himself was picked up once, but released for lack of evidence. In 1983, both Tyrell and Tarenthia were also indicted for passing counterfeit money; Tyrell was convicted whereas

Tarenthia was tentatively placed in a pretrial diversion program.

Coupled with the acts of violence, the raids apparently had a demoralizing effect on the two groups. In early 1983, two of Bonnie's trusted workers agreed to talk to law enforcement officers. Thereafter, local police, the Drug Enforcement Agency and, ultimately, the IRS began investigating the operations intensely.

The first indictment came down in June 1984; four months later, a superseding indictment charged twenty-four people, including the appellants here, with counts ranging from racketeering to perjury. Bonnie was indicted for conspiracy, racketeering (RICO), continuing criminal enterprise (CCE), possession and distribution of drugs, counterfeiting, Travel Act and firearm violations, and income tax evasion. Don and Tyrell were charged with conspiracy, RICO, and possession with intent to distribute—Don was also charged with distribution; Tyrell, with a firearms violation. Maranetta Smith, the west coast supplier, was indicted for conspiracy and a Travel Act violation; Tarenthia, with conspiracy, possession with intent and counterfeiting; Jo, with conspiracy, possession with intent and income tax evasion. Neal and Berry were charged with conspiracy, as well as possession with intent; Lawton and Norman, with conspiracy and distribution. Davis was indicted for perjury before the grand jury investigating Bonnie's income tax liability. Most of the remaining indictees[4] pleaded guilty, many in exchange for testimony at the trial.

### The Trial

Following two postponements, the trial was set for early December 1984. All pretrial motions were denied.

One week before trial, the jury was selected. One black venireman became an alternate; the actual panel was all white.

**3.** The "fortifications" were designed to delay police entry; over time, they became increasingly more sophisticated. By mid-1982, windows were covered with steel plates and burglar bars, and doorways shielded by solid steel cages with tiny waist-high windows through which drugs were passed. In a few apartments, black lights were provided to detect fluorescent powder that police sprinkled on the money used in their drug "buys."

**4.** Two other persons were also involved in the trial. One evidently pleaded guilty halfway through the proceeding; the other was acquitted.

All of the appellants are black. Just before the empanelling of the jury on the first day of trial, appellants moved to strike the jury on the ground that the prosecutor had used his peremptory challenges to remove all blacks. The motion was denied as untimely. Appellants then moved for a hearing or for the inclusion in the record of the race of the unselected jurors. The court took this motion under advisement; no ruling was ever explicitly made, and the motion was not reurged.

The trial lasted throughout December. The government presented numerous witnesses and documents. A large part of the evidence related either to Bonnie's tax evasion schemes or to the killing of Patrick Brooks and kidnapping of Leonard Johnson. Appellants Norman and Neal then testified in their own defense while other appellants submitted documentary evidence.

The jury voted to convict all the appellants, although Davis was acquitted on two counts. Appellants received sentences ranging from five years to 120 years and life without parole, plus substantial fines and forfeiture of property.

## DISCUSSION

Appellants raise a number of issues. Four apply to virtually every appellant; the remainder relate specifically to the individual appellants raising them.

### I. Common Issues

#### A. Conspiracy

All of the appellants except Davis were indicted in Count 1 for participating in a single conspiracy to acquire, possess and distribute narcotics: preludin, pyribenzamine, pentazocine and cocaine. They now challenge their Count 1 convictions on various grounds.

**Multiple Conspiracy Instruction**

During the jury instruction conference, Don Erwin contended that, while Count 1 of the indictment charged only a single overarching conspiracy,[5] the evidence, instead, established two or more smaller ones. According to his theory of defense, Don was entitled to an acquittal if the jury found that he belonged to a conspiracy other than the one charged in the indictment. Thus, he requested that the court instruct the jury to acquit him if it concluded that he was not a member of the charged conspiracy—even if it found him a member of a different conspiracy.[6] The other appellants joined in Don's request. The court, however, disagreed with their assessment of the evidence and, over objec-

---

**5.** Although the indictment's preamble describes only the "Erwin Organization" in detail, the charge in Count 1 can be read to cast a wider net. Count 1 charges that from February 1980 to November 1983, in Dallas and elsewhere, appellants "knowingly and intentionally did combine, conspire, confederate and agree together" to possess and distribute phenmetrazine, pyribenzamine, pentazocine and cocaine, 21 U.S.C. § 841(a)(1) (1982), and to obtain those drugs by fraud or subterfuge, § 843(b). It further alleges that the conspiracy involved interstate travel to obtain drugs, use of threats and force to protect the conspiracy's activities, and concealment of assets from law enforcement officials.

The jury instructions are also broad. *See* R.25:3261–65.

**6.** His proposed instruction, taken from *Pattern Jury Instructions* (West 1984), reads as follows:

You are further instructed, with regard to the alleged conspiracy offense, that proof of several separate conspiracies is not proof of the single, overall conspiracy charged in the indictment unless one of the several conspira-

cies which is proved is the single conspiracy which the indictment charges. What you must do is determine whether the single conspiracy charged in the indictment existed between two or more conspirators. If you find that no such conspiracy existed, then you must acquit the Defendants as to that charge. However, if you are satisfied that such a conspiracy existed, you must determine who were the members of that conspiracy.

If you find that a particular Defendant is a member of another conspiracy, not the one charged in the indictment, then you must acquit that Defendant. In other words, to find a Defendant guilty you must find that he was a member of the conspiracy charged in the indictment and not some other, separate conspiracy.

R.5:1150. We do not suggest, of course, that the court was limited to this formulation of the instruction, *see United States v. Bright*, 630 F.2d 804, 821 (5th Cir.1980), but only that this or a similar instruction should have been given.

tion, refused to give Don's proposed instruction.[7] Appellants now contend that the court's refusal to instruct on their theory of defense constitutes reversible error. We agree.

■ It is well settled that whether the evidence shows one or multiple conspiracies is a factual question for the jury to decide. *See, e.g., United States v. Elam,* 678 F.2d 1234, 1245 (5th Cir.1982); *United States v. Michel,* 588 F.2d 986, 995 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979); *United States v. Becker,* 569 F.2d 951, 961 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978). It is equally well established that a defendant is entitled to a separate instruction charging the jury on his theory of defense where he specifically and timely requests such an instruction and his theory has a "legal and evidentiary foundation." *United States v. Washington,* 688 F.2d 953, 958 (5th Cir.1982); *see also United States v. Fowler,* 735 F.2d 823, 828 (5th Cir.1984); *United States v. Curry,* 681 F.2d 406, 413 (5th Cir.1982). Thus, where the evidence arguably raises a question of multiple conspiracies, a defendant, upon request, is entitled to an instruction on that theory. *See United States v. Sutherland,* 656 F.2d 1181, 1189 n. 5 (5th Cir.1981), *cert. denied,* 455 U.S. 949, 102 S.Ct. 1451, 71 L.Ed.2d 663 (1982).

The court may decide, as a matter of law, that the evidence fails to raise a factual question for the jury. *United States v. Metz,* 608 F.2d 147, 158 (5th Cir.1979), *cert. denied,* 449 U.S. 821, 101 S.Ct. 80, 66 L.Ed.2d 24 (1980). As with all defense theories, however, the court commits reversible error when it refuses a defendant's specific request to instruct on a multiple conspiracy theory and the theory has "'any evidentiary support whatsoever.'" *See Fowler,* 735 F.2d at 828 (quoting *United States v. Goss,* 650 F.2d 1336, 1344 (5th Cir.1981)); *Washington,* 688 F.2d at 958;

*United States v. Timberlake,* 559 F.2d 1375, 1379 (5th Cir.1977).

In reviewing the claims of error for the trial court's refusal to so instruct, we need only search for any evidence that supports a theory of multiple conspiracies. *See Curry,* 681 F.2d at 413; *cf. Elam,* 678 F.2d 1234 (according usual deference to properly instructed jury's finding of single conspiracy). As Don's theory differs from the other appellants', we will review the evidence as to each theory individually.

#### a. Don Erwin

■ Don contends that the evidence showed two separate conspiracies, one headed by himself and the other by Bonnie. Of all the appellants, only he was not a member of Bonnie's conspiracy; although he may have had his own conspiracy, argues Don, it was unrelated to Bonnie's, the one described in the indictment.

■ The focus in a conspiracy charge is on the dimensions of the alleged illegal agreement to pursue a common purpose or goal or to achieve various objectives. *See Elam,* 678 F.2d at 1245; *United States v. Marable,* 578 F.2d 151, 153 (5th Cir.1978); *United States v. Perez,* 489 F.2d 51, 62 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 644 (1974); *United States v. Morado,* 454 F.2d 167, 171 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). In reviewing a claim of multiple conspiracies, we consider (1) the time frame; (2) the locations of the events charged as part of the conspiracy; (3) the persons acting as co-conspirators; (4) the statutory offenses charged in the indictment; and (5) the overt acts or other description of the offense charged which indicate the nature and scope of the activity that the government seeks to punish in the case. *See United States v. Stricklin,* 591 F.2d 1112, 1122 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979) (citation omitted); *see*

---

7. The court stated: "I don't think there is evidence of any dual conspiracies, and the indictment—I think the indictment alleges one conspiracy and I think that's what the question is before the jury. And I've been pointed to no evidence, in my judgment, that leads to the conclusion that there are multiple conspiracies; so I'll overrule the objection." R.24:3055.

*also Elam,* 678 F.2d at 1246 (inherent nature of the criminal scheme; interrelationship, including overlapping membership, between various parts to the scheme; common goal).

Here, the evidence does indicate that Don ran an operation in most respects independent from Bonnie's. Witnesses consistently identified apartments as belonging either to Don or to Bonnie. Similarly, co-conspirators testified that they worked either for Don or for Bonnie and obtained supplies and turned over profits to their respective bosses. With the exception of a brief time in the fall of 1982, there was virtually no interchange of personnel or other evidence that co-conspirators worked for both.[8] Furthermore, even Bonnie himself is alleged to have identified as his brother's the drugs and money stolen by Patrick Brooks and Stevie McGee.[9]

On the other hand, the two groups operated similarly in the same time period and in close proximity, cooperating with each other and sharing information. Their technique of pill distribution was identical. There is no evidence of intergroup competition, such as the undercutting of each other's prices. Moreover, Don obtained most of his supplies from Bonnie, and Bonnie evidently put him in touch with his California supplier since the two made at least one concurrent trip to California to obtain drugs. Finally, there is Bonnie's decision to kill Patrick Brooks and Don's acquiescence in that decision. Brooks was believed to have stolen Don's money and supplies following Don's arrest for distribution. Although the theft affected only Don's group directly, Bonnie acted as if motivated by an intent to warn both groups against similar future acts of insubordination; in either camp, such thefts would pose a clear threat to the success of a common goal.

While the latter evidence would warrant our affirming a jury finding of a single conspiracy, it is not so overwhelming that the court could decide the question as a matter of law. We conclude, therefore, that Don was entitled to a multiple conspiracy instruction and that it was reversible error to refuse the instruction.

**b. Cocaine Conspiracy**

■ The remaining appellants contend that the evidence showed a separate conspiracy to distribute cocaine, within or apart from the conspiracy to distribute pills. All deny that they agreed to participate in the charged conspiracy, which includes the sale of cocaine.

While the evidence here is somewhat weaker than for Don's theory, we nevertheless conclude that there was enough to send the question to the jury. Although several of the same names were mentioned in connection with both pills and cocaine, some allocation of personnel is possible. Frankie Mae Reese, Louelda Johnson, Bonnie and Smith were identified as deeply involved in the cocaine business, whereas Diana Berry and Joe Neal were not implicated at all—and Tarenthia only marginally.[10]

Furthermore, uncontested testimony indicated that the pill and cocaine distribution networks were completely different. The pills were sold to all comers from the fortified apartments in South Dallas throughout

---

**8.** For example, although many co-conspirators noted that they had been inside apartments run by the other brother, they testified that they were just "visiting"; if they worked, it was unauthorized. The joint meeting which the government's brief emphasizes arguably overlaps the time period of the partnership. Furthermore, the three or four employees who did switch allegiances evidently did so after obtaining approval from both brothers.

**9.** The government points to the fact that, while Brooks was lying tied up on Bonnie's kitchen floor before his death, he called Bonnie "Bossman" even though he was ostensibly working for Don. This reference has little independent significance, however, in light of Patrick's condition at the time and Bonnie's alleged repeated references to "Don's money and drugs."

**10.** The evidence of Tarenthia Erwin's involvement was slim. Leonard Johnson testified that she once brought a shipment of handbags containing cocaine to Harding Street while he was present. Lynetter Amie, however, testified that she herself had delivered the shipment.

the early 1980's. They were mainly supplied by Maranetta Smith in California, carried east by co-conspirators, in double-wrapped plastic pill bottles or baggies containing 50 pills each, and buried or stored in mini-warehouses until needed.

By contrast, the cocaine was sold only to a few private customers outside the South Dallas area, such as "Big Red" in Omaha and Fred Youngberg (who traded counterfeit money for his), most heavily during 1982–83. It was obtained from various sources: "Herman Aristobal" in Chicago, female smugglers from Peru, "Lupe," and "Raquel"; and buried or stored in mayonaise or pickle jars.

Considering this evidence in light of the factors listed above, we cannot say as a matter of law that only a single conspiracy existed; appellants were entitled to have the jury determine whether they participated in the conspiracy charged in the indictment. The court's decision to take the issue from the jury constituted reversible error.

**Other Conspiracy-Related Issues**

With an eye to the possibility of retrial, we will address appellants' two remaining conspiracy-related contentions. They argue first that the court erred in refusing to instruct the jury on a lesser included offense of conspiracy to distribute only the pills. We disagree.

■ The basic theory of conspiracy is vicarious liability. *United States v. Bolts*, 558 F.2d 316, 325 (5th Cir.1977), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978) (citations omitted); *accord United States v. Johnson*, 713 F.2d 633, 646 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). "The gist of the crime ... and the characteristic which defines its breadth is the unlawful agreement." *Marable*, 578 F.2d at 153. A co-conspirator cannot limit his participation to only part of that agreement; "once a defendant becomes associat-

ed with a conspiracy, he is responsible for all acts of it," [11] *Bolts*, 558 F.2d at 325. Where the multiple objectives of a single alleged conspiracy are adequately proved by the evidence, a lesser included offense instruction is unnecessary; there is only one offense: conspiracy. The question for the jury is whether or not each defendant, in fact, agreed to join the particular conspiracy described in the indictment; the jury need not decide that any defendant is, instead, guilty of a different conspiracy involving a different agreement and fewer and/or less serious objectives.

■ Appellants last argue that the evidence was insufficient to establish their membership in the conspiracy as charged. To convict them for conspiracy, the government had to prove that (1) the unlawful agreement existed; (2) each appellant knew of the agreement; and (3) with that knowledge, he voluntarily participated in the conspiracy. *See Michel*, 588 F.2d at 995 (citations omitted). In reviewing a challenge to the sufficiency of the evidence, we view the evidence, together with all reasonable inferences, in the light most favorable to the government to assess whether a reasonable, properly-instructed jury could have found all the essential elements of the charge beyond a reasonable doubt. *United States v. Merida*, 765 F.2d 1205, 1222 (5th Cir.1985); *United States v. Del Aguila-Reyes*, 722 F.2d 155, 157 (5th Cir.1983).

Here, evidence not only links all the appellants to the conspiracy but also delineates their individual roles in it. Bonnie's and Don's positions have already been discussed. The evidence indicates that, in addition to selling and acting as a look-out, Tyrell Erwin had organizational duties such as recruiting, delivering pills and collecting money from apartments. Jo Erwin, Robyn Norman and Glenda Lawton assisted in cataloging, dispensing and storing supplies, as well as doing periodic work in the apartments or at the Catfish Oasis.

---

**11.** When the various objectives carry different penalties, however, the court should, of course, consider each defendant's actual role in the conspiracy in determining his sentence. *See, e.g.,* *United States v. Alvarez*, 735 F.2d 461, 466–68 (11th Cir.1984); *Packnett v. United States Government*, 503 F.2d 949, 950–51 (5th Cir. 1974).

Diana Berry did a bit of everything; Tarenthia Erwin helped out occasionally when needed. Maranetta Smith acquired pills in California and may have sold cocaine. Joe Neal sold pills for a short time in the fall of 1982.[12] Had the jury, after proper instruction, concluded that appellants had participated in the single conspiracy alleged in the indictment, on this evidence, the conviction could be affirmed.

## B. Severance/Misjoinder

On various grounds, Joe Neal, Maranetta Smith, Grace Davis and Jo, Tarenthia and Don Erwin challenge their joint trial. They contend that either they were misjoined or the court erred in refusing to sever all or some of their counts.

Rule 8(a), Fed.R.Crim.P., allows joinder of offenses where they are of a similar character or are based on acts or transactions connected to or constituting parts of a common plan or scheme.[13] Rule 8(b) permits the joint trial of multiple defendants where they are alleged to have participated in the same act or transaction or same series of acts or transactions.

Ordinarily, defendants who are indicted together should be tried together. *United States v. Michel*, 588 F.2d 986, 1001 (5th Cir.), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Here, all of the appellants were charged in a single indictment. Furthermore, with the exception of Davis, all were charged with participating in a single conspiracy; those appellants were properly joined. Davis' perjury charges stem from an investigation into profits from that conspiracy; though the question is a close one, we find her joinder, too, was not improper.

Where joinder is proper, the trial court may grant a severance if it ap-

pears that the defendants will be prejudiced by a joint trial. Fed.R.Crim.P. 14; *United States v. Duzac*, 622 F.2d 911, 912 (5th Cir.), *cert. denied*, 449 U.S. 1012, 101 S.Ct. 570, 66 L.Ed.2d 471 (1980); *United States v. Wayman*, 510 F.2d 1020, 1024 (5th Cir.), *cert. denied*, 423 U.S. 846, 96 S.Ct. 84, 46 L.Ed.2d 67 (1975). The denial of a severance motion will be reversed only for abuse of discretion, upon a showing of specific and compelling prejudice. In ruling on a motion to sever, the court must weigh any prejudice the defendants might suffer against the government's interest in the judicial economy of a joint trial. *United States v. Staller*, 616 F.2d 1284, 1294 (5th Cir.), *cert. denied*, 449 U.S. 869, 101 S.Ct. 207, 66 L.Ed.2d 89 (1980). The court should also consider whether some defendants may be unduly prejudiced by harmful "spill-over" of evidence against other defendants. *United States v. Johnson*, 713 F.2d 633, 639 (11th Cir.1983), *cert. denied*, 465 U.S. 1081, 104 S.Ct. 1447, 79 L.Ed.2d 766 (1984). Nevertheless, compelling prejudice is not shown if it appears that, through use of cautionary instructions, the jury could reasonably separate the evidence and render impartial verdicts as to each defendant. *See United States v. Bolts*, 558 F.2d 316, 322–23 (5th Cir.1977), *cert. denied*, 439 U.S. 898, 99 S.Ct. 262, 58 L.Ed.2d 246 (1978).

To show prejudice, appellants here contend that a large part of the trial consisted of evidence of the two kidnappings, two beatings and one killing. Evidence of these activities, which differed qualitatively from the crimes with which the appellants were actually charged (drug related activities, counterfeiting and perjury) poisoned the jury's minds against all of the appellants. The jury's task was further compli-

---

**12.** Joe Neal argues that he did not "voluntarily" participate in the conspiracy because testimony indicated that he was afraid of Bonnie. Neal has not argued, however, that he was in any way coerced into participating; rather, he apparently started working out of friendship for Leonard Hawkins and Terry McGee. That he later developed a fear for Bonnie would not vitiate the initial voluntariness of his participation.

**13.** Tarenthia Erwin also argues that her counterfeiting charges fail to meet the requirements of Rule 8(a). There is no merit to this argument. The evidence showed that the bills she was charged with passing were identical in type to those connected to Tyrell.

cated, they claim, by the numerous nicknames and vague references to the fortified apartments. It was thus impossible for the jury to untangle the evidence and apply it against only the appropriate defendant.

With one exception, we do not agree. Certainly, evidence of the more egregious crimes, to some extent unnecessarily cumulative, did take up a large part of the trial. However, most of the remaining evidence directly pertained to the conspiracy, counterfeiting and drug charges. Moreover, the court frequently cautioned the jury—before, during and after the trial—about the proper use of the evidence. The jury's questions during its deliberations, coupled with its acquittals of Sarah Dorne on all counts and Grace Davis on two, demonstrate the care it gave to sorting through the confusing testimony. Furthermore, with few exceptions, we find that the record fully supports the jury's verdicts. Thus, while the question is extremely close, we conclude that all but one of the appellants have failed to demonstrate the compelling prejudice needed for reversal. *See United States v. Martino,* 648 F.2d 367, 385–86 (5th Cir.1981), *on reh. in part on other grounds,* 681 F.2d 952 (5th Cir.1982), *cert. aff.,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983).

The exception is Grace Davis. The charges against her were already only peripherally related to those alleged against the other appellants. As the trial progress-ed, it became increasingly apparent that very little of the mountainous evidence was usable against her, and almost none of it applied directly. The prejudice she suffered from the joint trial, then, far outweighed any benefit of judicial economy. While the court perhaps cannot be faulted for refusing to sever her case before trial, it abused its discretion in denying her severance motion when she reurged it at the close of the evidence. Accordingly, her convictions on Counts 31 and 33 are reversed.[14]

### C. Peremptory Challenges

Glenda Lawton, Maranetta Smith, and Bonnie, Jo and Tyrell Erwin contend the government improperly utilized its peremptory challenges to strike all blacks from the jury panel. Jury selection took place one week prior to trial. Although some of the sixty-odd veniremen were black, all of the jurors selected were white. The following week, just before the jury was empanelled, Lawton, joined by all the appellants, moved to strike the panel for racial discrimination in its selection. The court denied their motion because it was (1) untimely; (2) unsupported by Fifth Circuit precedent; and (3) contested by the government, which vouched for its proper use of the challenges. *See* R.11:12–13. Lawton then moved to include both the government's strike list and a list of the race of the venire in the record. The court took the

---

**14.** Tarenthia Erwin and Grace Davis also challenge their joinder because it denied them the benefit of exculpatory testimony from a co-defendant. Each claim that Tyrell Erwin would have testified on her behalf in a separate trial, but remained silent due to the joinder. This argument lacks merit.

Where a motion to sever is premised on a promise of exculpatory evidence from a co-defendant, the moving defendant bears the burden of proving (1) the co-defendant's willingness to testify in a separate trial; (2) the exculpatory nature of the testimony, including some indication of its probable content; and (3) the co-defendant's decision not to take the stand in a trial at which his own guilt or innocence is to be determined. *Duzac,* 622 F.2d at 912; *United States v. Rice,* 550 F.2d 1364, 1369 (5th Cir.), *cert. denied,* 434 U.S. 954, 98 S.Ct. 479, 54 L.Ed.2d 312 (1977). Here, in support of their motions, appellants presented only an affidavit from Tyrell's attorney attesting to a belief that Tyrell would present evidence in some way helpful to their cases. This affidavit was not enough. Without more, the court had no way of evaluating the exculpatory effect of the asserted testimony in order to weigh it against the benefits of a joint trial. We thus find no abuse in the court's refusal to sever on this ground.

Tarenthia further contends that she herself wanted to testify about the counterfeiting charges. She failed to take the stand, however, to avoid the "embarrassment" of refusing to answer questions about the drug counts, about which she did not wish to speak. While we sympathize with her dilemma, we cannot find that the mere possibility of embarrassment constitutes compelling prejudice.

motion under advisement. Lawton never reurged her motion or pressed for a ruling, and the court took no further action; the record does not contain these requested documents.

Appellants argue that the recent decision of *Batson v. Kentucky*, —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), mandates that their case be remanded for a hearing on the government's alleged racially discriminatory use of its peremptory challenges in this case. *Batson* concerned a black defendant whose timely motion to strike a jury panel was denied by the trial court. The Supreme Court held that a criminal defendant can make a prima facie case for discrimination by showing that (1) he is a member of a cognizable racial group; (2) the prosecutor used his peremptory challenges to remove from the venire members of the defendant's race; and (3) these and other circumstances, including the fact that peremptory challenges are prone to discriminatory use, raise an inference that the government struck veniremen on account of their race. *Id.* at ——, 106 S.Ct. at 1722–23. Once the prima facie showing is made, the burden shifts to the government to articulate a neutral reason for its strikes.[15] *Id.* at ——, 106 S.Ct. at 1723.

■■■ Because we agree with the trial court that appellants' motion was untimely, we conclude that *Batson* does not apply to this case.[16] The Court in *Batson* envisioned that a motion to strike would be made promptly, probably before the venire was dismissed. *See id.* at —— & n. 24, 106 S.Ct. at 1724 & n. 24. Here, appellants waited a full week before moving to strike the panel. Although the jury was not yet empanelled, the trial was about to begin and all of the unselected veniremen had been released. The difficulty confronting the court cannot be dismissed lightly since only half of the original group of 125 survived until the jury selection and additional publicity had occurred in the intervening week, *see* R.11:11. The court could not have summoned a new venire without greatly delaying the start of the trial. As appellants have offered no justification for the eleventh-hour nature of their motion, *Batson* does not provide them with a ground for reversal or remand.

**D. Voir Dire**

Bonnie Erwin, Tyrell Erwin and Glenda Lawton contend that the trial court erred in failing to voir dire prospective jurors concerning possible racial bias. Lawton had requested three questions aimed at discovering prejudice against blacks and against narcotics.[17] The court did not ask these questions; instead, it asked specifically about drugs but only generally about other sources of bias.[18] Appellants now

**15.** Appellants have not yet made a prima facie showing of discrimination, but they assert that the excluded documents would establish the evidentiary basis for their claim and request that we supplement the record accordingly. Under the circumstances of this case, we decline to do so.

**16.** In *Esquivel v. McCotter*, 791 F.2d 350, (5th Cir. 1986), we held that *Batson* would not be given retroactive application in habeas corpus cases but left open the question of its applicability to cases on direct appeal. Because of our disposition of this issue, we need not reach that question here either. As we noted in *Esquivel*, however, the Supreme Court has recently signalled that the old test of *Stovall v. Denno*, 388 U.S. 293, 296–97, 87 S.Ct. 1967, 1969–70, 18 L.Ed.2d 1199 (1967), which we found dispositive in *Esquivel*, may not be the exclusive means for determining the retroactive applicability of new constitutional principles to cases pending on

direct appeal. *See Shea v. Louisiana*, —— U.S. ——, 105 S.Ct. 1065, 84 L.Ed.2d 38 (1985); *Solem v. Stumes*, 465 U.S. 638, 651–56, 104 S.Ct. 1338, 1346–48, 79 L.Ed.2d 579 (1984) (Powell, J., concurring); *United States v. Johnson*, 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982).

**17.** Lawton's proposed questions were:
> 20. Do you believe that blacks are more likely to be involved in using and selling drugs than whites?
> 21. Do you believe that white people are more likely to tell the truth than blacks?
> 22. Would the fact that the defendants are black in any way affect your decision in this case? If so, describe.

*See* R.4:898–99.

**18.** The court asked: "Is there anyone on the panel who for any reason, whether I've asked about it or not, could not sit as a fair and impartial juror in this case?" R.10:40.

argue that the court's failure to ask their proposed questions constitutes reversible error. We disagree.

■■■ Although the trial court has substantial discretion in deciding how to conduct a voir dire, it ordinarily should allow a criminal defendant to determine whether or not to inquire into racial or ethnic prejudice. *See Rosales-Lopez v. United States,* 451 U.S. 182, 189–91, 101 S.Ct. 1629, 1634–36, 68 L.Ed.2d 22 (1981); *United States v. Groce,* 682 F.2d 1359, 1361–62 (11th Cir. 1982). If the defendant requests such an inquiry, the court should comply with the request. Nevertheless, the court's refusal to do so constitutes reversible error only where special circumstances in the case indicate a "reasonable possibility that racial or ethnic prejudice might have influenced the jury," *Rosales-Lopez,* 451 U.S. at 191, 101 S.Ct. at 1636, such that "absent questioning about racial prejudice, the jurors would not be as 'indifferent as [they stand] unsworn.'" *Ristaino v. Ross,* 424 U.S. 589, 596, 96 S.Ct. 1017, 1021, 47 L.Ed.2d 258 (1976) (quoting Coke on Littleton 155b (19th ed. 1832)). Special circumstances arise in cases where the victim and the defendant are of different races, *e.g., Turner v. Murray,* —- U.S. ——, 106 S.Ct. 1683, 90 L.Ed.2d 27 (1986) (capital murder case involving black defendant and white victim), or where racial issues are "inextricably bound up with the conduct of the trial," *Ham v. South Carolina,* 409 U.S. 524, 93 S.Ct. 848, 35 L.Ed.2d 46 (1973) (black civil rights activist whose defense was that he had been framed).

■■■ Here, appellants have demonstrated no special circumstances. Not only appellants, but also the few known victims and most of the non-law-enforcement witnesses were black. Furthermore, appellants were introduced during the voir dire; the venire knew both that they were black and that the case involved narcotics [19] when the court asked its general question concerning bias. In addition, appellants did

not specifically request these questions when the court asked counsel for additional issues. Thus, while we agree that the court should have asked the proposed questions, we find no reversible error in its failure to do so.

## II. Individual Issues

### A. CCE/RICO/Predicate Offenses

Bonnie, Tyrell and Don Erwin challenge their convictions and sentences in Count 3, for violating the Racketeer Influenced and Corrupt Organizations statute (RICO), 18 U.S.C. §§ 1961–62 (1982). Bonnie also raises several legal objections to his conviction and sentence in Count 2, for engaging in a continuing criminal enterprise (CCE), 21 U.S.C. § 848 (1982), the "kingpin" statute for serious drug offenders.

**Bonnie**

■■■ Bonnie argues first that his sentence of life without parole for CCE exceeds the statutory maximum. This argument has no merit. Section 848(a) sets the sentence at not less than 10 years nor more than life imprisonment. Furthermore, § 848(c) specifies that CCE sentences shall be without parole.

Alternatively, he asserts that the penalty constitutes cruel and unusual punishment, in violation of the Eighth Amendment. Construing this argument to mean that his sentence is disproportionate, we nevertheless disagree. In *Solem v. Helm,* 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983), a case involving a disproportionality argument by a petty offender sentenced under a recidivist statute to life without parole, the Supreme Court noted that substantial deference must be given to legislative decisions concerning sentencing. *Id.* at 290, 103 S.Ct. at 3009. Where a sentence falls within the statutory limits, the Court listed several factors for appellate courts to consider in assessing whether that sentence violates the Eighth Amendment. These factors include (1) the relationship between

---

**19.** The court excused one venireman for cause as a result of his responses to the drug-related questions. *See* R.10:36–37.

the gravity of the offense and the harshness of the penalty; and (2) comparable sentences imposed on other criminals and for comparable crimes. *Id.* at 290–92, 103 S.Ct. at 3010–11. Considering these factors and according due deference to Congress' decision to set floors· but not ceilings for CCE penalties, we find that Bonnie's sentence, while severe, is not unconstitutionally disproportionate to the gravity of his offense. *See, e.g., United States v. Rhodes,* 779 F.2d 1019, 1026–29 (4th Cir.1985).

▮▮▮ He next contends that the substantive predicate offenses for the RICO and CCE violations are lesser included offenses and, thus, cannot support separate convictions and consecutive sentences. These contentions also lack merit. In *Garrett v. United States,* —— U.S. ——, 105 S.Ct. 2407, 85 L.Ed.2d 764 (1985), the Supreme Court held that a defendant can be sentenced consecutively for CCE and substantive predicate offenses without violating the Double Jeopardy Clause of the Fifth Amendment. *See id.* at ——, 105 S.Ct. at 2419–20. Nor does double jeopardy result from consecutive sentences for RICO and its underlying offenses. *E.g., United States v. Phillips,* 664 F.2d 971, 1009 n. 55 (5th Cir.1981), *cert. denied,* 457 U.S. 1136, 102 S.Ct. 2965, 73 L.Ed.2d 1354 (1982); *United States v. Hawkins,* 658 F.2d 279, 287–88 (5th Cir.1981); *United States v. Peacock,* 654 F.2d 339, 348–49 (5th Cir. 1981), *cert. denied,* 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983). Furthermore, as RICO is not a lesser included offense of CCE, a court may also impose consecutive sentences for these convictions. *Phillips,* 664 F.2d at 1013.

20. There seems to us to be an inconsistency between the facts in *Garrett,* where the defendant's two conspiracy convictions served as predicate offenses for his CCE conviction, and the result of *Jeffers. Garrett* did not overrule *Jeffers,* however; on the contrary, the *Garrett* Court expressly approved the distinction in *Jeffers* between § 846 conspiracies and substantive predicate offenses. *See Garrett,* 105 S.Ct. at 2420. *Accord United States v. Boldin,* 772 F.2d 719, 730–31 (11th Cir.1985), *modified on other grounds,* 779 F.2d 618 (11th Cir), *cert. denied,*

▮▮ Bonnie then contends that his § 846 conspiracy conviction and sentence cannot stand because conspiracy is a lesser included offense of CCE. Although we have already reversed his conspiracy conviction, we note for purposes of retrial that, with this contention, we agree. The plurality opinion in *Jeffers v. United States,* 432 U.S. 137, 97 S.Ct. 2207, 53 L.Ed.2d 168 (1977), indicated that, while a defendant can be indicted for the two offenses, he may not be sentenced for them both. In *Jeffers,* the Supreme Court reduced the defendant's separate fines for conspiracy and CCE to $100,000, the maximum allowed for CCE. *Id.* at 157–58, 97 S.Ct. at 2220. This result is consistent with our cases holding that a § 846 conspiracy is a lesser included offense of CCE.[20] *See, e.g., United States v. Stricklin,* 591 F.2d 1112, 1123 (5th Cir.), *cert. denied,* 444 U.S. 963, 100 S.Ct. 449, 62 L.Ed.2d 375 (1979); *see also United States v. Michel,* 588 F.2d 986, 1000–01 (5th Cir.), *cert. denied,* 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32 (1979). Because of his CCE conviction, Bonnie may not be retried on Count 1.

▮▮▮ Bonnie next claims that the jury instruction on murder, one of several uncharged RICO predicate offenses, was defective. His first claim—that the instruction failed to include a Texas procedural rule requiring independent corroboration of an accomplice's testimony—is meritless. " '[T]he reference to state law in the [RICO] statute is for the purpose of defining the *conduct* prohibited' and is not meant to incorporate the state ... procedural rules." *United States v. Brown,* 555 F.2d 407, 418 n. 22 (5th Cir.1977), *cert. denied,* 435 U.S. 904, 98 S.Ct. 1448, 55

106 S.Ct. 1269 (1986); *United States v. Schuster,* 769 F.2d 337, 344–45 (6th Cir.1985), *cert. denied,* 106 S.Ct. 1210 (1986). Defendant Garrett challenged only the use as a predicate offense of his prior conviction for marijuana importation and his consecutive sentences for that substantive offense and CCE. The district court had imposed concurrent prison sentences for CCE and the two conspiracies although the fines were cumulative, and Garrett did not include them in his appeal.

L.Ed.2d 494 (1978) (emphasis in original) (quoting *United States v. Revel*, 493 F.2d 1 (5th Cir.1974)); *see also United States v. Welch*, 656 F.2d 1039, 1058 (5th Cir.1981), *cert. denied*, 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982) (reference to state law in RICO statute for definitional purpose only); *United States v. Malatesta*, 583 F.2d 748, 757–58 (5th Cir.1978), *on reh.*, 590 F.2d 1379 (5th Cir.), *cert. denied*, 444 U.S. 846, 100 S.Ct. 91, 62 L.Ed.2d 59 (1979) (same); *United States v. Bagaric*, 706 F.2d 42, 62–63 (2d Cir.), *cert. denied*, 464 U.S. 840, 104 S.Ct. 134, 78 L.Ed.2d 128 (1983) (same). Equally without merit is his second claim—that the instruction failed to explain possible justifications and excuses. As the evidence raised no issue of justifiable homicide, an instruction to that effect would have been superfluous and confusing.

He then descends to frivolousness by challenging the sufficiency of the evidence to support his convictions for all of the predicate offenses underlying his RICO and CCE convictions. Virtually all of the evidence in this three-and-one-half-week trial centered around Bonnie's conduct, and fully established all of the charged offenses. The government presented substantial documentary evidence and the testimony of numerous independent witnesses, in addition to the co-conspirators. The jury was entitled to find Bonnie guilty as charged.

### Tyrell

Like Bonnie, Tyrell challenges his consecutive sentences for RICO and the underlying predicate offenses. As stated above, this challenge has no merit.[21]

██ He further argues that his prior conviction for counterfeiting cannot constitute one of the requisite two predicate offenses for RICO. This argument is equally meritless. In a subsequent trial for RICO, the government may count, as a predicate offense, a defendant's prior conviction for an offense falling within the definition of "racketeering activity," 18 U.S.C. § 1961(1) (1982). *E.g., Phillips*, 664 F.2d at 1009, 1015; *Hawkins*, 658 F.2d at 288; *see also United States v. Black*, 759 F.2d 71, 72–73 (D.C.Cir.1985).

### Don

Don contends that there is insufficient evidence to support his convictions for RICO and the underlying predicate offenses of distribution (Count 14) and conspiracy (Count 1).[22] We have reversed his Count 1 conviction and, thus, the RICO charge must fall as well, for lack of a second predicate offense. *See Ruggiero*, 726 F.2d at 921. Furthermore, we hold that the evidence does not establish a sufficient nexus between the act of distribution and the "Erwin Organization," the RICO "enterprise."

Unlike a § 846 conspiracy, which focuses on an illicit agreement, *Phillips*, 664 F.2d at 1010, RICO is aimed at the illegal use of an "enterprise," *United States v. Cauble*, 706 F.2d 1322, 1330 (5th Cir.1983), *cert. denied*, 465 U.S. 1005, 104 S.Ct. 996, 79

**21.** Our reversal of the conspiracy count, one of Tyrell's four alleged predicate offenses, does not affect his RICO conviction. The jury convicted Tyrell of one other predicate offense, the Count 18 distribution. Tyrell had already been convicted of another, counterfeiting. Even if the jury disbelieved the evidence of the third, the uncharged kidnapping of Leonard Johnson, the requisite two nevertheless remain. *See United States v. Peacock*, 654 F.2d 339, 348 (5th Cir. 1981) *on reh. in part on other grounds*, 686 F.2d 356 (5th Cir.1982), *cert. denied*, 464 U.S. 965, 104 S.Ct. 404, 78 L.Ed.2d 344 (1985); *United States v. Pepe*, 747 F.2d 632, 667–68 (11th Cir. 1984); *cf. United States v. Ruggiero*, 726 F.2d 913, 921–23 (2d Cir.), *cert. denied*, —— U.S. ——, 105 S.Ct. 118, 83 L.Ed.2d 60 (1984) (where defi-

nition of one of eight predicate acts was legally insufficient and no offense was charged as separate substantive count, RICO count must fall).

**22.** Although the indictment attributed three predicate acts to Don: conspiracy, distribution of phenmetrazine, and kidnapping; in its instructions to the jury, the court listed only the first two; it did not include the kidnapping of Patrick Brooks. R.25:3271.

The government appears to contend that the Count 13 pentazocine distribution count also constituted a predicate offense. Neither the jury instructions nor the indictment support this contention.

L.Ed.2d 229 (1984). To convict under § 1962(c), the government must prove the existence of an enterprise, the defendant's employment by or association with that enterprise, and his participation in the conduct of the enterprise's affairs through "a pattern of racketeering activity," *see Cauble*, 706 F.2d at 1331, defined in § 1961(1) and (5) to include at least two acts involving "murder, kidnapping ... or dealing in narcotic or other dangerous drugs" punishable under state or federal law.

■■■ Racketeering activity alone does not violate RICO. Rather, the activity must further the affairs of the enterprise. *United States v. Manzella*, 782 F.2d 533, 538 (5th Cir.), *cert. denied,* — U.S. —, 106 S.Ct. 1991, 90 L.Ed.2d — (1986); *Phillips*, 664 F.2d at 1014; *United States v. Martino*, 648 F.2d 367, 382 (5th Cir. 1981), *on reh. in part on other grounds,* 681 F.2d 952 (5th Cir.1982), *aff'd,* 464 U.S. 16, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (acts performed should be "necessary and helpful to the operation of the enterprise"). "[T]here must be a nexus between the enterprise, the defendant and the pattern of racketeering activity." *Cauble*, 706 F.2d at 1333 (finding insufficient nexus to "participation" unless (1) defendant has in fact committed the alleged racketeering acts; (2) his position in the enterprise facilitated his commission of those acts; and (3) the predicate acts had some effect on the enterprise); *United States v. Mitchell*, 777 F.2d 248, 258 (5th Cir.1985), *cert. denied,* — U.S. —, 106 S.Ct. 1493, 89 L.Ed.2d 895 (1986) (racketeering activity must "be conducted through a defined enterprise"); *United States v. Welch*, 656 F.2d 1039, 1060–61 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1768, 72 L.Ed.2d 173 (1982) (acts must be "related to" affairs of enterprise); *see also United States v. Turkette*, 452 U.S. 576, 583, 101 S.Ct. 2524,

2528–29, 69 L.Ed.2d 246 (1981) (activities must be "connected" to enterprise); *Phillips*, 664 F.2d at 1011.

The contours of a conspiracy may wholly overlap those of the enterprise. In that case, the racketeering activity of a co-conspirator may well be sufficiently connected to the enterprise to violate RICO. When the conspiracy is defined more broadly than the enterprise, however, a nexus cannot be inferred: not every act of a co-conspirator necessarily furthers the enterprise's affairs. Then, the nexus element becomes especially critical to proof of a RICO violation.[23]

■■■ Here, as discussed in Part IA, the indictment alleges a conspiracy which arguably encompassed both the Erwin Organization and Don's narcotics business. The charge in Count 3, however, limits the RICO enterprise to the Erwin Organization, a particular entity directed by Bonnie, whose myriad activities included not only narcotics distribution but also counterfeiting and money laundering, primarily for the benefit of Bonnie. As Don was not a member of that organization, the government had to prove a nexus between the Erwin Organization and Don's distribution of phenmetrazine.

The evidence failed to establish that connection. In this respect, Don's relation to the Erwin Organization constituted little more than that of an independent dealer to his primary—but not his only—supplier. There was no evidence that Bonnie provided the particular pills which Don was convicted of distributing or that the profit gained by Don and his employees from that sale was to be shared with the Erwin Organization, *i.e.,* the "enterprise." Without more, the sale and the enterprise are not sufficiently connected.[24] *Cf. United States*

**23.** Although none of the appellants have challenged the RICO jury instruction, we note that it fails to explain the need for this nexus. Instead, it asked the jury to look for a connection between the two racketeering acts. *See* R.25:3269–70 ("the Government must prove ... that such offenses were connected with each other by some common, plan or motive so as to

constitute a pattern and not merely a series of isolated or disconnected acts").

**24.** To substitute Don's business for the Erwin Organization language in the indictment would materially change the meaning of the charge and constitute an amendment of the indictment, *per se* grounds for reversal. *See United States v.*

*v. Nerone,* 563 F.2d 836, 851–52 (7th Cir. 1977), *cert. denied,* 435 U.S. 951, 98 S.Ct. 1577, 55 L.Ed.2d 801 (1978) (reversing for insufficient nexus).

The remainder of our opinion has no precedential value, *see* Loc.R. 47.5 and is not published. For the reasons stated in the published and unpublished portions of the opinion, the judgment of this court is as follows.

All the appellants' convictions on Count 1 and Grace Davis' conviction on Count 33 are reversed; Bonnie Erwin may not be retried on Count 1. The following convictions are reversed and acquittals are directed: Don Erwin's on Count 3, Jo Erwin's on Counts 26–29, and Grace Davis' on Counts 31. The appeal of Robyn Norman on Count 12 is dismissed, and the remaining convictions of the other appellants affirmed.

REVERSED in part, AFFIRMED in part, REMANDED for further proceedings.

*Davis,* 679 F.2d 845, 851 (11th Cir.1982), *cert. denied,* 459 U.S. 1207, 103 S.Ct. 1198, 75 L.Ed.2d 44 (1983).