**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert James DEVINE, Jr., John Leon Robinette, a/k/a John Quigman, Tommy Ward Barker, Veronica Ann Martinez, a/k/a Ronnie, and Irvin Jay Mitzman, a/k/a Irvin Jay Milzman, a/k/a Jay Irvin Mitzman, a/k/a Herman Tilt, and Larry Joseph Cullum, Defendants–Appellants.**

No. 90–8156.

United States Court of Appeals,
Fifth Circuit.

June 20, 1991.

Charles Warren McDonald, Waco, Tex. (court-appointed), for Devine.

Linda Gassaway, Waco, Tex. (court-appointed), for Robinette.

John Hurley, Waco, Tex. (court appointed), for Barker.

Walter M. Reaves, Jr., Oak West, Tex. (court appointed), for Martinez.

Kerry P. FitzGerald, Dallas, Tex., W. V. Dunnam, Jr., Waco, Tex., Wm. T. Habern, Riverside, Tex., for Milzman.

Rodney S. Goble, Linda M. Gassaway, Waco, Tex. (court appointed), for Cullum.

Steven L. Snyder, LeRoy M. Jahn, Asst. U.S. Attys., Ronald F. Ederer, U.S. Atty., San Antonio, Tex., for plaintiff-appellee.

Before WISDOM, KING and JOLLY, Circuit Judges.

E. GRADY JOLLY, Circuit Judge:

Six defendants, Robert Devine, Jr., John Robinette, Tommy Barker, Veronica Martinez, Irvin Jay Milzman, and Larry Cullum, appeal their convictions for various offenses arising out of a drug conspiracy that involved over thirty-six participants in a large-scale operation to manufacture and distribute methamphetamine. For the reasons stated below, we affirm in all respects except as to Robinette's conspiracy conviction and sentence, 21 U.S.C. § 846, under count 2 of the indictment, and Cullum's fifteen-year sentence on tax evasion charges, 26 U.S.C. § 7206(1), under counts 25 and 26 of the indictment. We vacate Robinette's conviction and sentence for conspiring to possess with intent to distribute methamphetamine on grounds of double jeopardy. We vacate Cullum's fifteen-year sentence for filing false federal income tax returns and remand to the district court with directions to impose a sentence of three years imprisonment on each count.

I

The facts of this case describe the rise and fall of a large drug enterprise spanning over a decade of continuous illicit activity. For our purposes, we begin in 1983. At that time, Wesley Gerald Schneider was selling precursor chemicals utilized in the manufacture of methamphetamine to Billy McGoy. McGoy, in turn, was selling the precursor chemicals to John Robinette, a known drug dealer and the alleged leader of the drug conspiracy at issue in this case.

On November 6, 1983, McGoy introduced Schneider to Robinette, at which time, Robinette confided to Schneider that he had been manufacturing methamphetamine with McGoy and Glen Rogers for a substantial period of time. He then asked Schneider to replace McGoy in his drug business. Schneider agreed, on the condition that his identity not be revealed to any other member of Robinette's organization. Thereafter, Schneider provided precursor chemicals for the manufacture of methamphetamine to Robinette in return for one-fourth of the currency generated from the sale of the drug.

Later, Rogers introduced Robinette to James Magill, who also became a partner in the enterprise. Magill told Robinette that methamphetamine could be manufactured at a 400-acre ranch near Fairfield, Texas, owned by a friend, Larry Cullum. Robinette, Rogers, and Magill met with Cullum and proposed that his ranch be used for the manufacture of the drug. Cullum asked the parties to execute a deer hunting lease so that he would not be implicated in their drug conspiracy. Thus, beginning in January 1983, Robinette, Rogers, and Magill manufactured methamphetamine at Cullum Farms. Magill, who had previously learned how to manufacture methamphetamine, was the original and initial "cook" for Robinette's illegal business. In return for providing the property for the first manufacture, Robinette paid Cullum $15,-000.

This first manufacture at Cullum Farms utilized traditional glassware and yielded approximately seventeen pounds of methamphetamine. The conspirators, however, soon discovered that methamphetamine could be manufactured on a much larger basis by using propane hot water heaters. Magill testified at trial that phenylacetone, the immediate precursor chemical in the manufacture of methamphetamine, was manufactured in hot water heaters into which 110 pounds of phenylacetic acid, 70–74 pounds of sodium acetate, and 21 gallons of acetic anhydride would be loaded and cooked for 20–25 hours. The finished methamphetamine powder was heat-sealed

in bags utilizing a "seal-a-meal" kitchen appliance. The water heaters had to undergo substantial adaptation for the manufacture of phenylacetone and their use involved a unique technique that permitted Robinette to obtain a 40–pound yield of methamphetamine for every manufacture. This was a large-scale manufacturing technique that had previously been unknown to law enforcement authorities.

Rogers had originated the idea to use the water heaters and had participated in the manufacture of the drug at Cullum Farms on one occasion. However, Rogers began stealing drugs from Robinette and was consequently eased out of the business. He was replaced by Cullum, who was not present at the first manufacture but who at later manufactures took an active role in the operation. Thereafter, Robinette, Cullum, and Magill manufactured methamphetamine at Cullum Farms on several occasions.

In 1983, Robinette asked Daniel Garrett to help finance the methamphetamine laboratory. Robinette had previously borrowed money from Irvin Jay Milzman but their relationship proved to be too volatile and tenuous to sustain steady financial support for the drug operation. Garrett agreed to fund the laboratory in return for a portion of the proceeds.

In 1984 or 1985, Robinette ousted Magill from the drug enterprise because his addiction to methamphetamine caused him to be an unreliable business partner. Robinette then asked Schneider to assist in the manufacturing process. In Magill's absence, the manufacturing yields decreased. In order to correct the manufacturing problems and to improve production, Schneider suggested to Robinette and Cullum that they employ the services of Edward Crawford, who had a doctorate degree in chemistry. At that time, Crawford was in jail awaiting trial on state charges for possession of phenylacetone with intent to manufacture methamphetamine. Robinette, Cullum, and Schneider raised $25,000 to pay Crawford's bond, and Crawford was released from jail on December 31, 1985. Crawford agreed to assist in the manufacturing process, and Schneider paid him $20,000 for his services.

In January 1986, the foursome manufactured 37 pounds of methamphetamine. Three months later, they manufactured 27 pounds. The last known manufacture at Cullum Farms occurred in October 1986, when Robinette, Cullum, and Crawford produced 13 pounds of methamphetamine.

The methamphetamine produced at Cullum Farms was distributed by various individuals. With the exception of Schneider, who let Robinette distribute his share, each of the partners had their own distributors. Robinette sold most of his share to Milzman, who was his largest purchaser, but Robinette had many other distributors, including: Tommy Ward Barker, Jack Ransom Ridge, Robert Devine, Steve Hutchins, and Veronica "Ronnie" Martinez, Robinette's girlfriend. Magill, before being ousted, distributed a portion of his methamphetamine to Danny Williamson, who wholesaled the narcotic to Cecil Calvin Hayes. After Magill was forced out of the business, Williamson obtained the drug from Cullum, who prior to this time allowed Robinette to distribute his share.

The evidence at trial demonstrated that Robinette ran a hierarchical organization, and that he gave gold arrowhead necklaces to associates who were members of the inner circle of the drug conspiracy. Those who owned and wore the necklace included: Robinette, Schneider, Cullum, Magill, Rogers, McGoy, Martinez, Ridge, Barker, and Devine.

As noted earlier, the last known manufacture of methamphetamine at Cullum Farms occurred in October 1986. The manufactures at Cullum Farms abruptly ceased at that time because in November 1986, Magill told Cullum that he had informed law enforcement officials about their drug operation. Magill had been arrested and charged with possession of a machine gun and in November 1986, had begun cooperating with the government as part of a plea bargain agreement. Cullum immediately told the other members of the conspiracy, and they quickly dismantled and destroyed the laboratory at Cullum Farms.

Thereafter, members of the conspiracy met twice at a restaurant in Houston where they discussed stories to explain how they knew one another and their intentions to leave the vicinity. In the early winter of 1987, Schneider and Cullum met at Williamson's office to decide whether to hire a professional assassin to murder Magill, but they ultimately abandoned the plan.

After the termination of the manufactures at Cullum Farms, Robinette introduced Schneider to Terry Lewis. Lewis had supplied Robinette with phenylacetic acid for Cullum Farms on one occasion when Schneider was not able to do so. At Robinette's request, Schneider furnished Lewis with chemicals and glassware to assist Lewis in establishing a methamphetamine laboratory at the old Flying "M" Ranch near Wimberley, Texas. Unlike the laboratory at Cullum Farms, this laboratory used conventional glassware instead of hot water heaters in the drug manufacturing process. In return, Lewis provided both Schneider and Robinette with methamphetamine produced at the Wimberley laboratory.

This second methamphetamine laboratory began operating in 1987 and was closed in 1988. On January 27, 1988, when federal agents raided the ranch, they found a driver's license belonging to Cecil Calvin Hayes. As noted earlier, Williamson, one of Robinette's drug distributors, had wholesaled methamphetamine produced at Cullum Farms to Hayes. Thus, the discovery of Hayes's driver's license, according to the government, indicated a link between the manufacturing operations at Cullum Farms and Wimberley.

## II

On June 13, 1989, a federal grand jury returned a 39–count superseding indictment, charging nineteen individuals [1] with numerous offenses, including the unlawful possession, manufacture and distribution of methamphetamine and tax fraud. Thirteen defendants [2] reached plea agreements with the government prior to trial. Four of these defendants, Williamson, Schneider, Crawford, and Ridge, agreed to cooperate with the government and to testify at trial. This left only six defendants who actually went to trial, as follows: Robinette, the alleged leader of the conspiracy; Martinez, Robinette's girlfriend and an alleged distributor of the drug; Cullum, the owner of the laboratory site at Cullum Farms and an alleged partner in the manufacturing operation; Milzman, Robinette's largest alleged drug distributor; and Barker and Devine, both alleged drug distributors.

Count two of the 39–count indictment charged all six defendants with an overall conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. § 846. In addition, count one charged Robinette with having operated a continuing criminal enterprise from January 1, 1982 until September 12, 1987, in violation of 21 U.S.C. § 848. Counts three through nine charged both Robinette and Cullum with the unlawful manufacture of phenylacetone, on seven separate occasions, in violation of 21 U.S.C. § 841(a)(1).

Count twelve charged Robinette and Martinez with possession with intent to distribute methamphetamine on September 11, 1987, in violation of 21 U.S.C. § 841(a)(1). Count nineteen charged Robinette with carrying a firearm during the commission of a drug trafficking felony on September 11, 1987, in violation of 18 U.S.C. § 924(c)(1). Counts twenty-two through twenty-four charged Robinette with willful income tax evasion for 1984, 1985, and

---

**1.** The original nineteen defendants were: John Robinette, Veronica "Ronnie" Martinez, Larry Cullum, Danny Williamson, Deborah Patrick Williamson, Wesley Gerald Schneider, Sue Ann Schneider, Edward Crawford, Glen Rogers, Tom Sawyer, Dale O'Quin, Sylvia O'Quin, Terry Lewis, Monica Lewis, Jack Ridge, Jr., Irvin Jay Milzman, Tommy Barker, Cecil Calvin Hayes, and Robert James Devine, Jr.

**2.** The thirteen defendants who pled guilty as part of a plea agreement were: Danny Williamson, Deborah Williamson, Wesley Schneider, Sue Ann Schneider, Edward Crawford, Glen Rogers, Tom Sawyer, Dale O'Quin, Sylvia O'Quin, Terry Lewis, Monica Lewis, Jack Ridge, Jr., and Cecil Calvin Hayes.

1986, respectively, in violation of 26 U.S.C. § 7201.

Counts twenty-five and twenty-six charged Cullum with filing a false federal income tax return for the years 1984 and 1985 in violation of 26 U.S.C. § 7206(1). Counts thirty-six and thirty-seven charged Milzman with filing false income tax returns for the years 1984 and 1985 in violation of 26 U.S.C. § 7206(1). All other counts of the 39-count indictment involved charges relating to the criminal activities of the thirteen defendants who entered into plea bargain agreements with the government.

On September 11, 1989, a jury convicted the six defendants on all charges of the indictment. All six defendants filed timely notices of appeal.

### III

The defendants in this case present no less than 31 issues for our review. Only a few of these issues merit our full attention. The remaining issues require little, if any, discussion, and we therefore address these only briefly.

### A

All six defendants argue that the district court erred in holding that the federal sentencing guidelines applied to count two of the indictment charging all defendants with conspiracy to possess with intent to distribute methamphetamine. They insist that this case should be remanded for resentencing as a pre-guidelines case. Application of the sentencing guidelines has serious consequences for these defendants, who, under their present sentences, are not eligible for parole or for other pre-guideline provisions, such as statutory good-time reductions.

■■■ The guideline provisions apply to any offense committed after October 31, 1987. This includes any offense that is initiated before October 31, 1987, but not completed until after that date. We held in *United States v. White*, 869 F.2d 822, 826 (5th Cir.), *cert. denied,* 490 U.S. 1112, 109 S.Ct. 3172, 104 L.Ed.2d 1033 (1989), that

conspiracies are continuing offenses and that, even when a conspiracy is formed before October 31, 1987, conspirators may be sentenced under the guidelines without violating the Ex Post Facto Clause of the Constitution, so long as there is evidence that the conspiracy continued after the effective date of the guidelines. Moreover, a conspirator will be sentenced under the guidelines even if he himself did not commit an act in furtherance of the conspiracy after October 31, 1987, or did not know of acts committed by other co-conspirators after October 31, 1987, if it was foreseeable that the conspiracy would continue past the effective date of the guidelines. *See, e.g., United States v. Walton,* 908 F.2d 1289, 1299–1300 (6th Cir.), *cert. denied sub nom. Mitchell v. United States,* —— U.S. ——, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990). This holding is based upon the principle that conspirators are generally held liable for the known or foreseeable acts of all other co-conspirators committed in furtherance of the conspiracy. *Pinkerton v. United States,* 328 U.S. 640, 647, 66 S.Ct. 1180, 1184, 90 L.Ed. 1489 (1946).

The district court determined that the guidelines applied to the conspiracy convictions in this case essentially because the evidence at trial showed one conspiracy involving both the Cullum Farms and Wimberley laboratories that did not end until July 16, 1988. We regard this determination as a factual finding protected by the clearly erroneous standard of review. 18 U.S.C. 3742(e); *see United States v. Franco–Torres,* 869 F.2d 797, 800 (5th Cir.1989).

The defendants argue that we should overrule the district court because the Cullum Farms and Wimberley manufactures involved mutually exclusive conspiracies, and the operation at Cullum Farms ended in October 1986, before the effective date of the guideline provisions. The defendants make this argument knowing that the sentencing guidelines will apply to them only if they are credited with their co-conspirators' activities in Wimberley. Thus, by alleging multiple conspiracies, they attempt to separate themselves from any conduct occurring after October 1986.

Count two of the indictment charged all defendants with a conspiracy to manufacture and distribute methamphetamine beginning in January 1982, and ending in July 1988. It was thus clear from the commencement of these criminal proceedings that the government considered all six defendants to be conspirators in the operation of *both* laboratories. Our review of the record, however, reveals that none of the defendants specifically requested a multiple conspiracy instruction, although they would have clearly been entitled to one. *See United States v. Erwin*, 793 F.2d 656 (5th Cir.) (multiple conspiracy instruction required where theory of multiple conspiracies has a legal and evidentiary foundation), *cert. denied*, 479 U.S. 991, 107 S.Ct. 589, 93 L.Ed.2d 590 (1986). At oral argument, one of the defendants explained this omission. The amount of drugs produced at the second laboratory at Wimberley was miniscule in comparison to the operation at Cullum Farms, and evidence of the activities of the Wimberley group adduced at trial was minimal, amounting to only six pages in the trial transcript. Apparently, the significance of the issue—whether the conspiracy continued past the date of the closing of the Cullum Farms laboratory— did not become apparent to the defendants until the government made known its intent to apply the guideline provisions during the sentencing hearing.

■ In any event, the determinative issue here is whether the district court's finding that there was only one conspiracy involving separate manufactures of methamphetamine at Cullum Farms and Wimberley was clearly erroneous. In that regard, we find it helpful to use the same analysis that we engage in when resolving a double jeopardy challenge where multiple conspiracies are charged. As in those cases, we focus here on the following elements: (1) the time period involved; (2) the persons acting as co-conspirators; (3) the statutory offenses charged in the indictment; (4) the nature and scope of the criminal activity; and (5) the places where the events alleged as the conspiracy took place. *United States v. Tammaro*, 636 F.2d 100, 103 (5th Cir.1981). We note that it is not

necessary for all of these elements to be met in order to establish the existence of two conspiracies. We turn to these elements merely for guidance in determining whether there was more than one agreement to manufacture and distribute methamphetamine.

■ As to the scope of the criminal activity, the government argues that the Cullum Farms and Wimberley operations had a common goal—the unlawful manufacture and distribution of methamphetamine—and a common supplier—Robinette. The government characterizes Robinette as the leader of both operations and cites *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir.1987), for its holding that a single conspiracy exists where a "key man" directs the illegal activities and various combinations of other participants assist in reaching the common goal. Indeed, at oral argument, the government maintained that if any of the defendants other than Robinette had set up the Wimberley laboratory, then the Wimberley operation almost certainly would have been charged as a separate drug conspiracy.

On the other hand, the defendants contend that there was no common mode of operation or distribution between the two laboratories. The government responds by pointing out that both laboratories manufactured methamphetamine using a method involving phenylacetone. As noted earlier, however, the Cullum Farms operation used hot water heaters, an indisputably novel method of manufacturing large quantities of methamphetamine; there was no evidence indicating that the Wimberley laboratory used this same unique method.

Regarding the nature of the scheme, the government maintains that the evidence demonstrated a hierarchy operated by Robinette with structured roles for co-conspirators, that changed when circumstances warranted. The government's view of the drug scheme is, as follows: Robinette originally manufactured narcotics with Magill, Cullum, and Rogers at Cullum Farms. Schneider provided the chemicals. Devine, Williamson, Barker, Ridge, Milzman, and

Martinez distributed the product. After Rogers and Magill were ousted from the conspiracy, Schneider, Cullum, and Robinette continued the manufacturing operation with the distribution system still intact. When Schneider could not obtain phenylacetic acid, Robinette obtained the chemical from Lewis. Eventually, the group recruited Crawford, a chemist, for his assistance. Magill was then arrested on a weapon possession charge and began cooperating with federal agents, which, of course, resulted in the immediate closing of the Cullum Farms operation.

Then, Robinette introduced Schneider to Lewis, told Schneider that Lewis was a "good guy," and asked Schneider to take care of Lewis for him. Schneider understood Robinette's request as a directive to sell precursor chemicals and glassware to Lewis so that Lewis could establish the drug laboratory at Wimberley. The government characterizes this action by Robinette as a direct order, rather than a mere character reference, as the defendants would have us believe. Schneider and Robinette received methamphetamine in return for their services. When the Wimberley laboratory was raided, federal agents found the driver's license of Hayes. Hayes had been a member of Robinette's drug distribution network at Cullum Farms.

In response, the defendants contend that there was no interdependence between the two labs, and the activities of one was not necessary or advantageous to the success of the other. Of course, this observation is a given point, since the laboratories did not operate simultaneously. The government's position, however, remains unchanged: Robinette, the supplier and source of methamphetamine for the drug enterprise, remained so after the government seized Cullum Farms in a forfeiture proceeding, by assisting in, if not overseeing, the development of the Wimberley laboratory.

The defendants' strongest argument for the existence of multiple conspiracies is that there was a significant difference in the identity of the participants in the drug operations at Cullum Farms and Wimberley. For example, each conspiracy involved the following individuals:

| Cullum Farms | Wimberley |
| --- | --- |
| Robinette | Robinette |
| Schneider | Schneider |
| Crawford | Crawford |
| Hayes | Hayes |
| Terry Lewis | Terry Lewis |
| Cullum | Monica Lewis |
| Magill | Dale O'Quin |
| Rogers | Sylvia O'Quin |
| Devine | Tom Ray Sawyer |
| Milzman | |
| Barker | |
| Ridge | |
| Williamson | |
| Martinez | |
| Hutchins | |
| Garrett | |

The above list includes the names of all possible participants in each drug operation. We note, however, that the defendants maintain that Robinette and Hayes should not be considered members of the Wimberley group, and that Terry Lewis should not be considered a member of the Cullum Farms group. We also note that the evidence at trial showed that Terry Lewis was the leader of the operation at Wimberley and that, other than introducing Schneider to Lewis, Robinette's involvement in the Wimberley laboratory was limited to receiving large amounts of methamphetamine. Also, the only evidence connecting Hayes to the manufactures at Wimberley was his driver's license. As for Lewis, he sold Robinette the chemicals to manufacture drugs at Cullum Farms on only one occasion.

The government nevertheless contends that with the participation of Robinette, Schneider, and Crawford in both manufactures, there is unity between the two groups. The district court apparently agreed with the government because it also concluded that the participants in the two laboratories substantially overlapped.

The only remaining factor in making this determination that we have not yet considered is the place where the events took place. As to this factor, we note only that these two drug laboratories were several hundred miles apart from each other and yet, according to the district court, "the

focus of both enterprises centered around Austin, Texas."

From our review of the record, as described by our discussion above, we conclude that the district court did not clearly err in determining that there was only one conspiracy involving both drug laboratories at Cullum Farms and Wimberley. First, the evidence showed that the last manufacture at Cullum Farms occurred in October 1986, and that the Wimberley manufactures began shortly thereafter in 1987. Notwithstanding this interruption, we believe the time frames are close enough together to indicate one continuing conspiracy to manufacture drugs. Second, we agree with the district court that there was a substantial, although not complete, overlapping of participants in the two drug manufacturing operations. Third, the conduct at both laboratories involved the same statutory offenses, as charged in the indictment. Fourth, the nature and scope of the criminal activity at Cullum Farms and Wimberley were substantially similar. Both involved the manufacture and distribution of methamphetamine, even though the method of manufacturing the drug significantly differed. Fifth, although the laboratories operated at different locations, the focal point of the activity, as shown by the drug distribution pattern of both operations, remained the same.

Thus, it was not error for the district court to apply the sentencing guidelines to the defendants' conspiracy convictions. Because we reach this conclusion, we need not address the government's second contention that, even if there were two separate conspiracies, the Cullum Farms participants engaged in acts in furtherance of their conspiracy after October 31, 1987, the effective date of the guideline provisions.

We still must address, however, the argument made by almost all of the defendants, although by some not as clearly as by others, that even if there is but one conspiracy involving both drug laboratories, the actions of the co-conspirators at Wimberley, all of whom reached plea agreements with the government, were not reasonably foreseeable. We disagree, if

only because of the size and scope of this drug distribution conspiracy, which we have discussed at length above. In short, we find it foreseeable to all six co-conspirators that, given the huge quantity of methamphetamine produced at Cullum Farms, the number of fellow conspirators involved in the operation, and the size of Robinette's distribution network, the illicit manufacturing operation would likely find some means of continuing and that the drug would still be made available for resale through this widely based distribution system even after the closing of that initial laboratory.

This leaves us with Devine's contention that he affirmatively withdrew from the conspiracy prior to the effective date of the guidelines. If so, then it was error for the district court to sentence him under the guidelines. Apparently, in late 1986 or early 1987, Devine and Ridge engaged in a taped conversation in which Devine said, "I am not involved in that anymore, my partner [Robinette] has fled, he has left the state."

In order to separate himself from the criminal acts of the Wimberley participants, Devine had to show that he acted affirmatively to defeat or disavow the purpose of the conspiracy. *United States v. Branch*, 850 F.2d 1080, 1083 (5th Cir.1988), *cert. denied*, 488 U.S. 1018, 109 S.Ct. 816, 102 L.Ed.2d 806 (1989). Otherwise, the conspiracy is presumed to continue. We find this self-serving statement alone insufficient to demonstrate that he had extricated himself from the proved conspiracy. Devine has, therefore, failed to carry his burden on this issue.

In a related argument, Milzman claims that this court should reverse his conviction because a fatal variance exists between count two of the indictment, which charged a single conspiracy, and the proof at trial, which he claims demonstrated the existence of at least two independent conspiracies. For Milzman's argument to succeed, he had to establish (1) that a variance between the indictment and proof occurred, and (2) that the variance affected his substantial rights. *Richerson*, 833 F.2d at 1152. We have already determined, however, that a single

conspiracy existed involving both drug laboratories. This conclusion forecloses Milzman's variance claim.

### B

■ Milzman and Devine contend that the trial court erred in refusing to submit a special interrogatory to the jury concerning the termination date of the conspiracy in order to determine whether the conspiracy continued after the effective date of the federal sentencing guidelines. The district court did not regard this determination as being within the purview of the jury and rendered its own factual findings supporting application of the guidelines.

The government suggests that the district court refused to submit the proposed instruction because the jury would have been required to determine the duration of the conspiracy by a preponderance of the evidence. Such an instruction, the government contends, would have only confused the jury as to the government's overall burden of proof with regard to the guilt or innocence of the defendants.

The defendants insist that the submission of such a charge to the jury is not unusual. As an example, they contend that the Eighth Circuit in *United States v. Wayne,* 903 F.2d 1188, 1197 (8th Cir.1990), relied, in part, on the jury's response to a special interrogatory in determining that the conspiracy at issue in that case continued beyond October 31, 1987, and that the guideline provisions thus applied. It is clear to us, however, that, regardless of the special interrogatory, the *Wayne* court relied on the district court's own factual conclusion that the conspiracy continued until May 1988. Indeed, the Eighth Circuit stated in its holding that it was "satisfied that the *court's* finding was not clearly erroneous." *Wayne,* 903 F.2d at 1197 (emphasis added).

In further support of their argument, the defendants direct our attention to those cases in which courts have held that it is reversible error to fail to submit a charge where facts are in dispute as to whether a criminal action is barred by the statute of limitations. *See United States v. Cian-*

*chetti,* 315 F.2d 584 (2d Cir.1963). We find these cases inapposite to the issue presented here. Neither Milzman nor Devine sought a determination from the jury as to whether the charged conspiracy crime was time-barred. Instead, both sought a determination from the jury on a question related to sentencing, which was clearly not within the province of the jury to decide. In short, they did not seek an answer from the jury that would determine their guilt or innocence, but one that would serve as no more than an advisory opinion to the judge. Moreover, although the issue was not raised for our review, we have in past decisions at least implicitly recognized the role of the district court in making this factual determination. *See United States v. Zapata–Alvarez,* 911 F.2d 1025, 1027 (5th Cir.1990); *United States v. Boyd,* 885 F.2d 246, 248 (5th Cir.1989).

Finally, we note as an aside that because all of the defendants in this case were charged and convicted of conspiring to manufacture and possess methamphetamine from 1982 until 1988, there is at least an implicit finding from the jury that the conspiracy did continue beyond the effective date of the guideline provisions. For the above stated reasons, we thus find no error in the district court's refusal to submit the requested interrogatory to the jury.

### C

■ Barker and Martinez argue that it was improper for the district court to sentence them on the basis of the total amount of methamphetamine produced and distributed during the course of the drug conspiracy because neither one of them was aware of the full extent of the drug operation.

According to the government, the Cullum Farms operation produced between 700 and 1200 pounds of methamphetamine, and the Wimberley operation produced a minimum of 60 pounds. The trial judge sentenced Barker and Martinez, as it did all the defendants, using the sum total of both these amounts, because he determined that the full objective of the conspiracy was reason-

ably foreseeable to all. Thus, the district court, pursuant to the federal sentencing guidelines in effect at the time of the offense, sentenced Barker and Martinez according to an unadjusted offense level of 36, the maximum applicable to over 25 kilograms of methamphetamine. We regard this determination by the sentencing judge as a factual finding reviewed only for clear error. *United States v. Thomas*, 870 F.2d 174, 176 (5th Cir.1989).

Under section 1B1.3(a) of the sentencing guidelines, a defendant's criminal offense level is based upon his relevant conduct. Relevant conduct includes all conduct for which the defendant would be otherwise accountable, including the acts of a co-conspirator performed in furtherance of the conspiracy unless "the conduct was neither within the scope of the defendant's agreement, nor was reasonably foreseeable in connection with the [jointly undertaken] criminal activity." U.S.S.G. § 1B1.3, note 1.

Both Barker and Martinez distributed proportionately small, but nonetheless sizeable, amounts of the methamphetamine manufactured at Cullum Farms. The government argues that given their long association with Robinette and their distribution of the drugs, the full extent of the manufacturing operation was foreseeable by both of them. In other words, because both dealt in sizeable amounts of narcotics, then both should be presumed to know that they were participating in an organization beyond their individual involvement.

Barker argues that the evidence showed only that he and Ridge received between 12 and 20 pounds of methamphetamine for sale. Thus, he maintains that the district court should have sentenced him based upon an offense level between 32 and 34. The government points out, however, that according to Ridge's testimony, Ridge and Barker had been involved in the methamphetamine business since the early 1980s. Moreover, Barker wore the gold arrowhead necklace signifying that he was a member of the inner circle of the conspiracy. Finally, Barker and Robinette shared at least a five-year history in the narcotics business, and Barker was his close associate, as evidenced in part by a photograph produced at trial showing Robinette kissing Barker.

Martinez similarly argues that her role in the conspiracy was limited. She admits distributing small amounts of methamphetamine but insists that she was not aware of the manufacturing operation. Indeed, she maintains that she was deliberately kept uninformed, as evidenced by the testimony of Schneider who stated at trial that Robinette did not trust Martinez and that he had instructed the conspirators not to discuss the manufacturing operation in her presence.

The government argues that a review of the evidence shows a long-term, close narcotics relationship between Robinette and his girlfriend, Martinez. For example, Martinez also wore the gold arrowhead necklace indicating her membership in the inner circle of the conspiracy. The evidence also showed that she sold narcotics as early as 1982. When asked about the source of the drugs she distributed, she told a friend, "John [Robinette] is a junk dealer." Moreover, Robinette had told Garrett that Martinez was a pound distributor of methamphetamine.

Furthermore, the evidence at trial indicated that during the course of the drug operation, Martinez received large amounts of money from an unknown source and purchased expensive automobiles for cash. For example, Martinez deposited into her bank account $30,090 in 1984, $27,228 in 1985, and $11,998 in 1986, although her payroll checks only totalled $7,508 during those three years. Martinez was listed the owner of a Porsche automobile purchased for cash in 1984. She traded this car for a 1984 Mercedes Benz automobile in September 1984. She purchased a 1984 Datsun 300 ZX automobile for cash on June 6, 1984. She traded this car on May 18, 1985, for a 1985 Mercedes Benz.

Martinez states that this financial evidence only establishes that she allowed Robinette to buy her expensive gifts and to use her checking account to pay certain expenses. To support her argument that she should not be held accountable for the

entire scope of the conspiracy, she relies on our decision in *United States v. Rivera*, 898 F.2d 442, 446 (5th Cir.1990). In *Rivera* we held that a defendant who was charged with possession of heroin could not be sentenced based on the entire amount of heroin attributable to his supplier where the evidence did not indicate that he was aware or should have been aware of his co-conspirators' distribution of heroin. Our decision in *Rivera*, however, is easily distinguished from the circumstances of the present case. In *Rivera* there was no indication of a long-term drug relationship between the individual defendant and his supplier; in this case, the evidence showed that Martinez sold drugs for Robinette over a number of years and was a member of the inner circle of a large narcotics association.

Based on a review of the evidence, the district court's finding regarding the quantity of drugs implicated by the manufacturing crime is not clearly erroneous. Martinez and Barker, by virtue of their relationship with Robinette and their roles in the conspiracy as distributors of the drug, could reasonably foresee the entire scope of the illegal enterprise. We thus find no error in the district court's application of the sentencing guidelines.

**D**

Cullum, Martinez, Robinette, and Milzman complain that their sentences are grossly disproportionate to the sentences received by the co-defendants who pled guilty. They insist that they were penalized for asserting their right to trial by jury because they received harsher sentences under the federal sentencing guidelines. They challenge their sentences as being violative of due process, equal protection, ex post facto, and cruel and unusual punishment.

Thirteen of the nineteen defendants named in the 39–count indictment pled guilty. A majority of those who entered guilty pleas did so to pre-guideline offenses and thus, according to the defendants, not only received lesser sentences but also benefitted from the absence of guideline provi-

sions, such as the denial of parole. Thus, the prosecution was able to offer and to procure lesser sentences for the thirteen defendants by deciding which offenses they could plead guilty to, based, in part, on which offenses would be subject to the guidelines.

To support their argument, the defendants cite *United States v. Boshell*, 728 F.Supp. 632 (E.D.Wash.1990). In this case, a federal district court held that the federal sentencing guidelines were unconstitutional as applied to the defendant because the government offered to the more culpable defendants plea bargains, which related only to charges pertaining to pre-guideline activity. According to the *Boshell* court, the prosecution's forcing the defendant, an "average" player in the drug conspiracy, to be sentenced under harsher post-guideline provisions, when the kingpins of the conspiracy received more favorable treatment under pre-guideline provisions, was tantamount to penalizing the defendant for going to trial.

■■■ We have held that a defendant cannot be punished by a more severe sentence because he unsuccessfully exercises his constitutional right to stand trial. *See Baker v. United States*, 412 F.2d 1069, 1073 (5th Cir.1969), *cert. denied*, 396 U.S. 1018, 90 S.Ct. 583, 24 L.Ed.2d 509 (1970). We have also held that a disparity of sentences among co-defendants does not, without more, constitute an abuse of discretion. *United States v. Lindell*, 881 F.2d 1313, 1324 (5th Cir.1989), *cert. denied sub nom. Kinnear v. United States*, — U.S. —, 110 S.Ct. 1152, 107 L.Ed.2d 1056 (1990). The defendants cannot rely upon their co-defendants' sentences as a yardstick for their own. *United States v. Hayes*, 589 F.2d 811, 827 (5th Cir.), *cert. denied*, 444 U.S. 847, 100 S.Ct. 93, 62 L.Ed.2d 60 (1979). Even if they could, their claim would not succeed because we do not find a significant disparity in the sentences received by Cullum, Martinez, Robinette, and Milzman.

■■■ To that end, we note that nine of the thirteen co-defendants agreed to cooperate with the government. Their sen-

tences are obviously the result of leniency and are not relevant to the present constitutional inquiry. *See United States v. Chase,* 838 F.2d 743, 751 (5th Cir.) (when co-defendant cooperates with government, sentence imposed on defendant who elects to go to trial is likely to be more substantial), *cert. denied sub nom. Mesa v. United States,* 486 U.S. 1035, 108 S.Ct. 2022, 100 L.Ed.2d 609 (1988). Thus, only the sentences received by Rogers, Dale O'Quin, Sylvia O'Quin, and Hayes would be important in determining if any significant disparity exists. Our comparison of the sentences received by these four co-defendants, however, reveals that they are indeed similar in length to the sentences received by Cullum, Martinez, Robinette, and Milzman.

For example, Rogers received a 20–year sentence for conspiring to distribute methamphetamine. This sentence is the same as that received by Cullum under count two of the indictment and greater than that received by all other defendants under count two with the exception of Robinette. Furthermore, Sylvia O'Quin received a 15–year sentence for possession with the intent to distribute methamphetamine. This is the same sentence as that received by Cullum under counts three through nine of the indictment.

Thus, we hold that even if we were inclined to adopt the arguments urged by the defendants—that the application of the guidelines to only those defendants who exercise their right to trial can violate the Constitution—under the facts of this case the defendants would be entitled to no relief. Finding no abuse of discretion, we affirm the district court's application of the sentencing guidelines.

### E

■ At the sentencing proceedings, the district court increased Milzman's base offense level by two levels under section 2D1.1(b)(1) of the federal sentencing guidelines for possession of a firearm during the commission of the drug offense. The commentary to section 2D1.1(b)(1) suggests that such an adjustment should be applied if the weapon was present during the commission of the crime "unless it is clearly improbable that the weapon was connected with the offense." In the instant case, the district court increased Milzman's sentence because it found that Milzman sold or gave Robinette a .20 gauge Mossburg shotgun as part of their illicit drug dealings. Milzman argues that the district court's enhancement of his sentence was improper because the evidence failed to show that he was ever actually in possession of the shotgun. We regard the district court's decision to apply section 2D1.1(b)(1) as a factual determination which we review only for clear error. *United States v. Paulk,* 917 F.2d 879 (5th Cir.1990).

At trial, Schneider testified that he thought the shotgun belonged to Milzman, even though the government seized the weapon from Robinette. Milzman regards this testimony as too speculative to support any finding that he was in possession of the firearm during the course of the drug conspiracy. This testimony, however, is not the only evidence linking Milzman with the shotgun. The government also introduced at trial several photographs seized from Milzman's residence showing him proudly displaying the weapon in the presence of other co-conspirators. Thus, he can hardly deny his possession of the gun at this point during the conspiracy.

To obtain this sentencing increase, the government had the burden to show by a preponderance of the evidence that Milzman either used or possessed the weapon in connection with the drug-trafficking offense. *United States v. Otero,* 868 F.2d 1412, 1414 (5th Cir.1989). Given Schneider's testimony and the above-described photographs showing him in possession of the gun, we find no clear error in the district court's enhancement of Milzman's sentence.

### F

■ Barker and Devine argue that they should be granted a reduction in their offense level under section 3B1.2 of the federal sentencing guidelines because they were only minimal or minor participants in

the conspiracy to distribute methamphetamine. Under that section of the sentencing guidelines, a minimal participant is entitled to a four-level decrease and a minor participant, to a two-level decrease. The application notes define a minimal participant as a defendant who is plainly "among the least culpable of those involved in the conduct of a group." Thus, for example, a defendant who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment would be considered a minimal participant and would be entitled to the reduction. *See* U.S.S.G. § 3B1.2, note 2. A defendant's lack of knowledge or understanding of the scope of the enterprise and of the activities of others is considered an important factor in making this factual determination under this provision. *Id.*, note 1. On the other hand, the notes define a minor participant in a more general manner as any defendant who is less culpable than most other participants, but whose role cannot be described as minimal. *Id.*, note 3.

The background information to the commentary indicates that the application of this section involves a determination that is heavily dependent upon the facts of the particular case. Thus, we should note at the outset that the district court's refusal to grant Barker and Devine any reduction under this section is entitled to great deference and should not be disturbed except for clear error.

Barker argues that the only evidence implicating him in the drug conspiracy was Ridge's testimony that he and Barker were partners in distributing between 12 and 20 pounds of methamphetamine from 1983 until 1986. Barker compares this amount with the entire amount produced from the manufactures at Cullum Farms, which the government estimated to be between 700 and 1200 pounds of methamphetamine. Barker also points out that he was charged in only one count of the 39–count indictment.

The government maintains in response that, contrary to the above assertions, the evidence showed that Barker and Ridge trafficked in large quantities of methamphetamine and cocaine for seven to nine years. Moreover, Barker wore the arrowhead necklace signifying his membership in the inner circle of the conspiracy.

Devine likewise argues that he was not as culpable as his co-conspirators. He maintains that "[e]very other Defendant in this conspiracy either had tax problems, major quantities of drugs, expensive cars, large amounts of money or expensive firearms." Devine depicts himself as a musician with no money and little possessions who played a very peripheral and minor role in the drug conspiracy. However, the evidence at trial showed that Devine sold methamphetamine for Robinette beginning as far back as 1982 and that during this time he distributed pound quantities of the drug. Furthermore, during a search of his residence, federal agents discovered drug ledgers reflecting thousands of dollars in narcotics sales. Finally, Devine also wore the gold necklace that symbolized the significance of his role in the conspiracy.

The above evidence indicates that the district court's finding that neither Barker nor Devine was a minor or minimal participant in the drug conspiracy was not clearly erroneous. Although Barker and Devine may be correct in contending that they were not the organizers or leaders of the conspiracy, there was sufficient evidence to support the finding that they were at least "average participants," which is all that is required to disqualify them for the reduction under section 3B1.2. *See, e.g., United States v. Mueller,* 902 F.2d 336, 346 (5th Cir.1990).

G

■ Milzman and Devine argue that the district court erred in failing to give a requested instruction on jury unanimity with regard to count two of the indictment charging all defendants with a conspiracy to possess with intent to distribute methamphetamine.

The United States Supreme Court in *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), held that federal criminal defendants have a Sixth

Amendment right to be convicted by a unanimous jury verdict. In *United States v. Gipson*, 553 F.2d 453, 457 (5th Cir.1977), this court held that the defendant's right to a unanimous verdict was violated if a guilty verdict was returned when the defendant was charged under a criminal statute prohibiting a number of acts, any one of which was sufficient to convict him, but not all of the jury members agreed that the defendant committed the actus reus element of any one offense charged.

After the district court read the instructions to the jury, Milzman objected "to the charge's failure to require unanimity as to the—at least one conspiracy as to the Defendant Milzman on the conspiracy count." Because the court had already provided a general unanimity instruction, it overruled Milzman's request. Milzman argues that the district court erred because the evidence showed the existence of separate conspiracies and, in the absence of a more specific charge, a general unanimity instruction merely confused the jury.

Milzman's argument is meritless. In view of our holding above that one conspiracy was properly proved and in view of the evidence at trial that Milzman agreed to be part of that single conspiracy, there was no potential for jury confusion. Under these circumstances, a guilty verdict secured by a general unanimity instruction could not reflect a divided decision as to whether Milzman was guilty of the drug conspiracy. We note that we are not here confronted with a situation where a defendant is charged with conspiring to violate several statutory provisions, which, of course, is an entirely different matter. *See, e.g., United States v. Bolts*, 558 F.2d 316, 325–26 (5th Cir.1977) (because a co-conspirator's liability is vicarious, there is no reason for jury to decide what particular statutory provision the defendant himself conspired to violate, so long as jury unanimously agrees that he participated in the conspiracy).

Unlike Milzman, Devine asserts a novel challenge with regard to the unanimous-verdict requirement. Although it is less than clear from his brief, we gather from his discussion at oral argument that his argument is as follows: he was entitled to a specific unanimous jury instruction because, from the proof offered at trial, it was possible for some of the jurors to find him guilty, and some to find him not guilty, of conspiring with Ridge and still others to find him guilty, and some to find him not guilty, of conspiring with Robinette; yet, although all jurors, in returning a conviction, would have found him guilty of some agreement, it would not have been for the same agreement. He argues that in order to return a proper guilty verdict under under count two, the jury should have been required unanimously to conclude with *which one* (or specifically both) of the two drug conspirators he made the agreement to join the methamphetamine operation. The general unanimity instruction given at trial, he contends, did not require them to reach this verdict, and consequently his constitutional right to a unanimous verdict was violated.

This argument is characterized more by legal legerdemain than by substance. The verdict of guilt requires only that the jury unanimously agree that Devine made some agreement to enter the conspiracy. If the jury could not unanimously agree that he was a participant in this broad drug conspiracy, then he did not commit the charged offense. Their guilty verdict consequently speaks for itself.

### H

Milzman and Devine argue that the district court erred in failing to instruct the jury on multiple conspiracies. They insist that their convictions should be reversed because a multiple conspiracy instruction is generally required where the evidence shows one or more conspiracies and the theory of multiple conspiracies has a "legal and evidentiary foundation." *See United States v. Erwin*, 793 F.2d 656 (5th Cir. 1986).

The government argues that neither defendant raised the objection at trial and that the district court's failure to include such a charge must be reviewed only for plain error. *See* Fed.R.Crim.P. 52(b). If so, then the defendants' argument must

fail because we have already held that a failure to instruct on multiple conspiracies generally does not constitute plain error. *See United States v. Richerson*, 833 F.2d 1147, 1155–56 (5th Cir.1987). The success of the defendants' argument, therefore, depends on whether the error was preserved at trial.

 Apparently, neither defendant, in his request *for jury instructions, included a charge on multiple conspiracies. However, both defendants contend that the error was preserved during the discussion regarding Milzman's request for a special interrogatory. Milzman had insisted that the court permit the jury to determine the date upon which the conspiracy ended so that the court could determine whether the federal sentencing guidelines applied. The discussion regarding application of the guidelines ended with the following remark by Milzman's counsel: "It depends on which conspiracy. There's two conspiracies, non-related, the jury is entitled to find." However, Milzman's counsel responded in the negative when asked if he would have any further objection on the matter if the court provided an instruction requesting the jury to find from the evidence the date upon which the conspiracy ended.

This discussion is hardly sufficient to place the trial judge on notice as to the nature of the objection, which Milzman and Devine now propose to have been a request for a multiple conspiracy instruction. Under Rule 30, Fed.R.Crim.P., "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds

of his objection." We held in *Henderson v. United States*, 425 F.2d 134, 144 (5th Cir. 1970), that the requirements of Rule 30 are met only when the objecting party identifies the subject and grounds of his objection with sufficient clarity to give the district court full understanding of its nature. The request for a special interrogatory in this case falls far short of this goal. For this reason, we find no merit in the defendants' argument.

## I

 Robinette argues that his conspiracy conviction must be set aside as a lesser included offense of a continuing criminal enterprise. *United States v. Michel*, 588 F.2d 986, 1001 (5th Cir.1979), *cert. denied*, 444 U.S. 825, 100 S.Ct. 47, 62 L.Ed.2d 32. Robinette was convicted for having operated a continuing criminal enterprise from January 1, 1982, until September 12, 1987, in violation of 21 U.S.C. § 848,[3] and for conspiring to distribute methamphetamine between January 1, 1982 and July 16, 1988 in violation of 21 U.S.C. § 846. The Supreme Court determined in *Jeffers v. United States*, 432 U.S. 137, 155–56, 97 S.Ct. 2207, 2218–19, 53 L.Ed.2d 168 (1977), and the government concedes, that a § 846 conspiracy is a lesser-included offense of a § 848 continuing criminal enterprise. Therefore, the Double Jeopardy Clause of the Fifth Amendment[4] bars punishment under both statutes.

The government argues that because Robinette failed to assert a double jeopardy challenge at trial, the defense is waived, and the district court's imposition of multiple sentences did not constitute plain error.[5] Fed.R.Civ.P. 52. In support of its

---

3. Section 848 defines the crime as a continuing series of violations of drug laws undertaken by a person in concert with five or more other persons with respect to whom such person occupies a management or supervisory position and from which such persons obtain substantial income or resources. 21 U.S.C. § 848.

4. The double jeopardy clause states: "[N]or shall any person be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V.

5. The government also argues that the conspiracy charge was properly prosecuted as a separate offense because it continued almost a year after the criminal enterprise ended. We reject this second argument. The question before us is not whether Robinette could have been prosecuted for acts falling outside the continuing criminal enterprise, but whether he was sentenced for the lesser included conspiracy offense within the same time frame. He clearly was, and thus, absent waiver, double jeopardy bars his conspiracy conviction and sentence.

position, the government cites our decision in *Grogan v. United States*, 394 F.2d 287 (5th Cir.1967), for its holding that a failure to assert a double jeopardy challenge waives the defense on appeal. In *Grogan*, however, the defendant complained of being tried on the same indictment in two successive trials. The constitutional error thus presented itself at the commencement of the second trial. Here, however, the error occurred in the same trial and first manifested itself when the district court failed to instruct the jury that it could not convict Robinette of both conspiracy and conducting a criminal enterprise.

Here, however, we find no evidence of any affirmative act by Robinette that might be construed as a voluntary and knowing waiver of his constitutional right not to receive multiple punishments for the same offense. *Cf. Jeffers*, 432 U.S. at 153, 97 S.Ct. at 2217 (defendant waived double jeopardy challenge by persuading trial court to order separate trials and by failing to raise objection at the time). Moreover, we believe that the multiple sentences do constitute plain error. The only appropriate remedy, therefore, is to vacate Robinette's conviction and sentence under count two of the indictment charging a conspiracy to distribute methamphetamine.[6] *United States v. Buckley*, 586 F.2d 498 (5th Cir.1978), *cert. denied*, 440 U.S. 982, 99 S.Ct. 1792, 60 L.Ed.2d 242 (1979).

### J

Two other separate challenges under the double jeopardy clause are raised on appeal by Barker, Robinette and Cullum. We address these two arguments only briefly.

First, Barker argues that his conviction under count two of the indictment is barred by double jeopardy because in establishing the existence of the drug conspiracy, the government proved conduct for which he had already been prosecuted. Barker's argument is based solely on the Supreme Court's decision in *Grady v. Corbin*, —— U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), which, he contends, relaxed the standard for determining whether successive prosecutions impermissibly involve the same offense.

We need not engage in any lengthy discussion about the *Grady* decision, however, because the prior drug charge which Barker insists precludes his conspiracy conviction was prosecuted by the State of Texas, a separate sovereign. It is well-established that the dual sovereignty doctrine permits both the federal and state governments to punish a defendant for the same offense without violating the double jeopardy clause. *United States v. Lanza*, 260 U.S. 377, 382, 43 S.Ct. 141, 142, 67 L.Ed. 314 (1922); *United States v. Harrison*, 918 F.2d 469, 474 (5th Cir.1990). Therefore, even if the conspiracy charge involved the same offense under the rationale of *Grady*, the double jeopardy clause does not protect Barker from both convictions.

Second, both Robinette and Cullum argue that their convictions on counts three through nine, charging both with the unlawful manufacture of phenylacetone on seven separate occasions, must be vacated on grounds of double jeopardy. Robinette insists that these charges are all lesser-included offenses of the continuing criminal enterprise charged in count one. In addition, Robinette posits the same constitutional challenge with regard to his conviction under count twelve, a separate drug possession and distribution charge. Cullum maintains that his conviction and sentence for conspiring to manufacture and distribute methamphetamine bars his conviction and sentence for the underlying substantive drug offenses charged in counts three through nine.

To support his argument, Robinette relies solely on this court's holding in *United*

---

**6.** Robinette was sentenced to 20 years imprisonment for conspiring to manufacture and distribute methamphetamine. In vacating his sentence under this count of the indictment, we grant little meaningful relief to Robinette, who received life imprisonment for having conducted a continuing criminal enterprise under count one of the indictment and a total of 45 years imprisonment on the remaining counts, not including the conspiracy conviction that we now reverse.

*States v. Chagra,* 669 F.2d 241 (5th Cir. 1982), which, apparently unknown to Robinette, was squarely rejected by the Supreme Court in *Garrett v. United States,* 471 U.S. 773, 783, 105 S.Ct. 2407, 2413, 85 L.Ed.2d 764 (1985) and by this court in *United States v. Guthrie,* 789 F.2d 356, 359–60 (5th Cir.1986) (en banc). In *Guthrie,* we held that "predicate offenses of a continuing criminal enterprise violation are not lesser included offenses of the continuing criminal enterprise for purposes of the Fifth Amendment's Double Jeopardy Clause." *Id.* at 360 (footnote omitted).

Cullum argues separately that the Supreme Court's recent decision in *Grady v. Corbin,* — U.S. ——, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990), requires us to reconsider our position on whether double jeopardy bars a conviction and sentence for both a conspiracy to commit drug offenses and the underlying substantive drug offenses on which the conspiracy is based. Cullum insists that although sentences for both statutory offenses may survive the same-offense test under *Blockburger v. United States,* 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932), they will not stand up under *Grady's* same-conduct test. We disagree.

*Grady* developed an additional standard for analyzing a double jeopardy challenge in the context of successive prosecutions. Here, however, Cullum complains that he has been subjected to multiple punishments in the same prosecution for the same offense. This area is one which the *Grady* Court did not intend to address. *See United States v. Ortiz–Alarcon,* 917 F.2d 651, 653 (1st Cir.1990) ("[I]t is crystal clear that the *Grady* court intended [its new standard] to apply only to successive prosecutions ... and not to multiple punishment cases."). Under our prior precedent which, contrary to Cullum's assertions remains unchanged by the *Grady* decision, his multiple sentences in the instant case do not constitute double jeopardy. *United States v. Levy,* 803 F.2d 1390, 1397 (5th Cir.1986) (conspiracy to commit crime and crime itself are separate offenses).

Finding no double jeopardy violation, we reject these challenges of Barker, Robinette, and Cullum.

### K

During Milzman's cross-examination of Schneider at trial, Milzman asked Schneider if he remembered their conversation at a local restaurant regarding Milzman's role in the conspiracy. Schneider testified that he did not remember any such conversation. Milzman then called James Parker to the stand to relate the contents of the conversation between Schneider and Milzman. Parker had been at the restaurant and had overheard their conversation. The district court excluded Parker's testimony as inadmissible hearsay. Milzman argues that in doing so, the district court abused its discretion.

If Parker had been allowed to testify, he would have recalled Milzman's questioning Schneider about what Schneider had told his attorney about his role in the alleged drug conspiracy. Schneider apparently informed Milzman that he told his attorney that "he was one of John Robinette's distribution points." Milzman stated in response, "You shouldn't be telling your attorney that, it's not so. I don't appreciate you telling your attorney those kind of things about me." Schneider said, "Well, perhaps I'm wrong. I'm sorry I brought it up."

Schneider had testified earlier at trial that Milzman was one of Robinette's close associates. Milzman wanted to impeach that testimony by forcing Schneider to admit that he had previously confessed to Milzman that he had been wrong about characterizing him as one of Robinette's distributors.

It is well-settled that evidence of a prior inconsistent statement is admissible to impeach a witness. Proof of such a statement may be elicited by extrinsic evidence only if the witness on cross-examination denies having made the statement. *United States v. Sisto,* 534 F.2d 616 (5th Cir.1976). The issue in this case is whether Schneider's failure to remember the statement constitutes such a denial. If so, then

the district court erred in excluding Parker's testimony as hearsay, because it was not being offered to show whether Milzman was distributing Robinette's drugs but, rather, to impeach Schneider's credibility. *See* Fed.R.Evid. 801(c).

We hold that on the facts of this case, Schneider's claim of faulty memory did not constitute an inconsistent statement. *See United States v. Balliviero,* 708 F.2d 934, 939–40 (5th Cir.), *cert. denied,* 464 U.S. 939, 104 S.Ct. 351, 78 L.Ed.2d 316 (1983). Thus, because Parker's statements could not be used to impeach Schneider, his testimony clearly constituted inadmissible hearsay. We find no abuse of discretion in the district court's decision to exclude Parker's testimony at trial.

## L

Milzman complains that the district court erred in allowing the introduction of the testimony of three witnesses, Ridge, William Shipman, and Garrett, in violation of Rule 404(b), Fed.R.Evid. Rule 404 provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

At trial, Ridge testified that at the end of 1979 or in 1980 he purchased between one-half to two ounces of cocaine from Milzman. Shipman testified that he also obtained cocaine from Milzman from 1980 until 1983. Garrett testified that in 1983 Robinette told him that he had previously borrowed money from Milzman to finance the drug manufacturing operation. Garrett also stated that, according to Robinette, Milzman sold cocaine to Robinette and Robinette sold methamphetamine to Milzman. In other words, Garrett testified that Robinette and Milzman would sometimes exchange drugs. This practice was confirmed by Schneider. Milzman complains that the trial court should have excluded the testimony of these three witnesses because it was impermissible char-

acter evidence and was inherently prejudicial.

Both parties agree that the admissibility of extrinsic offense evidence under Rule 404(b) depends on whether the evidence satisfies the following two-pronged test: (1) it must be relevant to an issue other than the defendant's character and (2) its probative value must not be substantially outweighed by its undue prejudicial effect. *United States v. Beechum,* 582 F.2d 898 (5th Cir.1978) (en banc), *cert. denied,* 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979). We approach Milzman's argument with the realization that there is always a danger inherent in the admission of such evidence that the jury will convict the defendant, not for the offense charged, but for the extrinsic offense. *United States v. Zabaneh,* 837 F.2d 1249 (5th Cir.1988).

The government contends that the testimony of Ridge and Shipman was admissible to prove intent, opportunity, and motive and that the testimony of Garrett was admissible to prove opportunity. Furthermore, it was admissible, in part, to demonstrate the inner workings of the conspiracy.

Milzman maintains that the three instances complained of involved cocaine and not methamphetamine, related to several sales or transfers of cocaine rather than to a manufacturing operation, and were temporally remote from the charged drug conspiracy. He claims that the government's case against him was very strong and that this extrinsic evidence added very little weight and should have been readily excluded as being unfairly prejudicial. Milzman also contends that these three incidents occurred well before the existence of the drug conspiracy charged in the indictment and were thus not relevant to show how the conspiracy began.

With regard to Garrett's testimony about Milzman's cocaine trafficking activities, the government argues that this evidence was necessary to prove that Milzman had an opportunity to trade cocaine for the methamphetamine produced by Robinette. *See*

*United States v. Webster,* 750 F.2d 307, 335–36 (5th Cir.1984) (extrinsic offense inextricably intertwined with conspiracy evidence is admissible). Moreover, Garrett's statement that Milzman had previously financed Robinette's drug operations was part of the conspiracy itself. The government disputes Milzman's statement that these incidents occurred well before the beginning of the conspiracy, since there was evidence that the conspiracy originated as early as 1980.

With regard to the testimony of Ridge and Shipman, the government relies on our decision in *United States v. Fortna,* 796 F.2d 724, 736 (5th Cir.), *cert. denied,* 479 U.S. 950, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986), to support its position that even if these transactions occurred before the conspiracy, they were admissible to prove Milzman's intent. In *Fortna,* the defendant objected to his co-conspirator's testimony that he had been involved in cocaine and marihuana smuggling operations that occurred before the time period covered by the indictment. The government in that case, as it does in this one, argued that the extrinsic offense evidence was relevant to the issue of the defendant's intent. In *Fortna,* we determined that the relevancy of such evidence must be assessed by comparing the state of mind required for the past and present offenses. We then held that the co-conspirator's testimony was clearly relevant to the issue of intent because the smuggling ventures described by the co-conspirator were very similar to those charged in the indictment.

The government likewise argues in this case that assuming that these three drug-related incidents did occur prior to the origins of the charged conspiracy, the intent required for a conspiracy to distribute cocaine is remarkably similar to the intent required for a conspiracy to distribute methamphetamine. Thus, under *Fortna,* Ridge and Shipman's testimony was clearly relevant on the issue of Milzman's intent.

Turning now to the second part of the *Beechum* test, we are required to weigh the probative value of the evidence against its undue prejudicial affect. By pleading not guilty, Milzman placed his intent to join the conspiracy a material issue in the case. Proof of his prior drug transactions was necessary to establish this essential element of the conspiracy offense. Thus, in this instance the probative value of the evidence was substantial and in the light of other testimony against Milzman did not unduly prejudice his case. Moreover, the record indicates that the trial judge instructed the jury as to the limited nature of this evidence. The jury was informed that it could not convict Milzman for the charged offenses simply because he sold cocaine on several past occasions.

The district court thus properly allowed this testimony and we reject Milzman's arguments on this issue.

## M

■ Milzman, Barker and Martinez challenge the sufficiency of the evidence supporting their convictions for conspiracy to possess with the intent to distribute methamphetamine. To convict the defendants of conspiracy, the government had to show beyond a reasonable doubt (1) an agreement between two or more persons to commit one or more violations of the narcotics laws and (2) the defendants' knowledge of, intention to join, and voluntary participation in the conspiracy. *United States v. Lechuga,* 888 F.2d 1472, 1476 (5th Cir.1989). In evaluating these challenges, we are required to examine the evidence and all reasonable inferences that may be drawn from it in the light most favorable to the jury verdict. *Id.*

### 1. Milzman

■ Milzman combines his sufficiency of evidence attack with an evidentiary challenge. He argues that the co-conspirator testimony of Ridge, Mary Smith, and Garrett was inadmissible hearsay because the government failed to prove by a preponderance of the non-hearsay evidence Milzman's connection to the conspiracy. Milzman contends that the evidence against him is insufficient without this testimony.

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides that "[a] statement is

not hearsay if ... [t]he statement is offered against a party and is ... a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Thus, before admitting the disputed testimony over Milzman's objection, the government had to show by a preponderance of the evidence that there was a conspiracy involving each declarant and Milzman, and that the statement was made "during the course and in furtherance of the conspiracy." The issue here, according to Milzman, is whether the district court could have relied solely upon the contents of the hearsay statements to determine the existence of a conspiracy or whether the government had to produce independent evidence on this factual issue before the alleged co-conspirators' testimony could be introduced as non-hearsay. Milzman contends that the latter is true, even though neither the Supreme Court nor this circuit has addressed the matter. *See, e.g., Bourjaily v. United States,* 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987). He therefore concludes that his conviction must be reversed because none of the non-hearsay independent evidence demonstrates his connection to the drug conspiracy.

The government, of course, disagrees with this conclusion and maintains that there was sufficient evidence independent of the testimony that established Milzman's knowing participation in the alleged conspiracy. For example, Schneider testified that he attended a series of meetings between Robinette and Milzman. During these meetings, Milzman and Robinette negotiated the price of the methamphetamine, Milzman arguing that he was entitled to a price reduction because he was Robinette's major buyer, because he paid cash for the drug, and because the methamphetamine was dark and impure. Schneider also testified that he observed Milzman delivering one-ounce quantities of cocaine to Robinette, apparently in exchange for more methamphetamine.

The government also points out that during the search of Milzman's home, agents found a seal-a-meal containing traces of methamphetamine and numerous photographs picturing Milzman with various members of the conspiracy, including Robinette, Barker, Hutchins, and Martinez. Milzman also expended great sums in currency during the years 1984 and 1985, a time period when he was not gainfully employed.

We hold that based on these facts, it was not error for the district court to conclude that the government had established the existence of a conspiracy and Milzman's participation in it. Thus, admission of the co-conspirator's statements under Rule 801(d)(2)(E) was proper. Bolstered by this testimony, the evidence was sufficient beyond a reasonable doubt for a jury to convict Milzman on the conspiracy offense.

#### 2. Barker

Barker complains that most of the evidence against him revolved around his friendship with Robinette and transactions involving cocaine, rather than methamphetamine. However, Ridge testified at trial that he and Barker were partners and sold Robinette's methamphetamine for at least five years. Viewing the evidence in the light most favorable to the government, it cannot be said that it was insufficient to prove beyond a reasonable doubt that Barker was a member of Robinette's drug conspiracy.

#### 3. Martinez

Martinez argues that she was purposely kept ignorant of the manufacturing operation managed by her boyfriend, Robinette, and that there was no direct evidence indicating that she even knew it existed. She claims that she was convicted merely because of her association with members of the conspiracy. *See United States v. Jackson,* 700 F.2d 181, 185 (5th Cir.1983).

The government contends that the evidence against Martinez demonstrated her knowing and voluntary participation. For example, during a search of Martinez's residence, agents found a note pad on which Martinez had written a letter to Garrett, threatening to testify that he bought a house with illegal funds unless he gave

money to Robinette. Also, Martinez distributed methamphetamine to Mary Teal and informed her that Robinette had supplied her with the drug. Robinette told Garrett that Martinez was a pound distributor. Martinez deposited large amounts of cash into her bank account in 1984, 1985, and 1986, even though her payroll checks during this time totalled less than $8000. She was also listed the owner of several expensive automobiles during this same time period. Finally, she purchased guns for Robinette, falsifying the Firearms Transaction Reports, and wore a gold arrowhead necklace signifying her membership in the inner circle of the conspiracy.

Based on this evidence, it cannot be said that a rational trier of fact could not find Martinez guilty of the conspiracy.

## N

The government requests that we remand this case and order the district court to conform the Judgment and Commitment Order to impose a three-year sentence under counts 25 and 26 of the indictment. Apparently this is the maximum term of imprisonment for these two tax evasion offenses but, because of a scrivener's error, the court's judgment sentenced Cullum to a fifteen-year term of imprisonment under each count.

We grant the government's request, because the transcript of the sentencing proceedings indicates that the trial judge intended to sentence Cullum to three years imprisonment. *See United States v. Shaw,* 920 F.2d 1225 (5th Cir.1991) (where there is a sentencing variation, oral pronouncement prevails over written judgment). We therefore remand the case to the district court with instructions to enter a judgment of three years under both counts.

## O

Cullum asks for relief by coram nobis, arguing that the sentencing judge was prejudiced against him. As evidence of his alleged bias, Cullum attached a copy of a letter written by the judge to another convicted drug felon in which he stated, "I am not prejudiced against you personally, only against you as one who engages in drug trafficking."

■■■■■■ A judge is required to disqualify himself if a reasonable person would have a rational basis for questioning his impartiality. 28 U.S.C. §§ 144, 455(a); *Liljeberg v. Health Serv. Acquisition Corp.,* 486 U.S. 847, 108 S.Ct. 2194, 2202, 100 L.Ed.2d 855 (1988). The nature of the bias, however, must be personal and not judicial. In this instance, the bias, if any, is certainly not personal, especially since the letter allegedly evidencing Judge Smith's prejudice was not even addressed or written to Cullum. In any event, we view the above statement as merely an expression of Judge Smith's opinion as to the seriousness of drug crimes. As such, it did not amount to legally cognizable prejudice.

## IV

For the reasons stated above,[7] Robinette's conviction and sentence for conspiring to possess and distribute methamphetamine under count 2 of the indictment are VACATED. Cullum's sentences for in-

---

**7.** We have carefully reviewed the remaining issues presented on appeal and have determined that none are sufficiently meritorious to warrant full discussion. We therefore dispose of these as follows:

The district court did not abuse its discretion in excluding as inadmissible hearsay the testimony of Robinette's only defense witness, Tim Ferguson. Ferguson's testimony does not fall within the purview of Rule 801(d)(1)(A), Fed.R. Evid., and Robinette failed to lay the proper foundation for its admission as a prior inconsistent statement under Rule 613(b), Fed.R.Evid.

The district court did not err in failing to hold *sua sponte* that counts five and seven of the indictment were multiplicious or that the government had failed to prove the time of the offenses for counts three through nine, involving seven unlawful manufactures of phenylacetone. There was sufficient evidence to indicate that the offenses charged in counts five and seven were separate and distinct from the crimes charged in counts four and six. The government's evidence sufficiently established the manufacturing dates reasonably near the dates alleged in counts three through nine of the indictment. *United States v. Tunnell,* 667 F.2d 1182, 1186 (5th Cir.1982).

The district court properly permitted Daniel Garrett to testify as to certain statements made by his co-conspirators pursuant to Rule 801(d)(2)(E), Fed.R.Evid. The statements made by Robinette to Garrett identifying the co-con-

come tax evasion under counts 25 and 26 are VACATED and the cause is REMANDED to the district court to impose a sentence of three-years imprisonment on each count. The judgments of conviction are in all other respects AFFIRMED.

VACATED IN PART.

AFFIRMED IN PART.

REMANDED.

spirators in the drug enterprise were clearly made in furtherance of the conspiracy. Moreover, the statements were admissible against Robinette as the admission of a party opponent under Rule 801(d)(2)(A), Fed.R.Evid.

The district court did not err in failing to rule *sua sponte* that a government witness, Colleen Buchanan, was incompetent to testify because she was a government informant paid on a contingent fee basis. The defendants attempt to rely on a per se disqualification rule established in *Williamson v. United States,* 311 F.2d 441 (5th Cir.1962), a decision which we expressly overruled in *United States v. Cervantes–Pacheco,* 826 F.2d 310, 312 (5th Cir.1987) (en banc).

The district court did not commit reversible error in ruling that the government investigator's interview notes of Magill and Garrett were Jencks material. The notes were not "statements" as that term is defined under the Jencks Act, 18 U.S.C. § 3500, because neither witness manifested either an adoption or approval of the reports. *See* 18 U.S.C. 3500(e).

The district court did not err in failing to instruct the jury that Robinette was an accomplice as a matter of law. To provide such an instruction to the jury would have been tantamount to directing a verdict against Robinette.

The trial court did not err in refusing to list Magill and Garrett as co-defendants in its instructions to the jury. Neither had been indicted by the government and, therefore, neither had entered guilty pleas. Moreover, the district court provided a general accomplice instruction which sufficiently covered all testifying co-conspirators.

The district court did not err in instructing the jury on the law of conscious avoidance. The instruction was properly issued in response to Milzman's tax-fraud defense.

The district court did not err in failing to define specific intent in its jury instructions. Having already defined the term "wilfully," the district court was not required to repeat itself by defining specific intent. *United States v. Garza,* 754 F.2d 1202, 1210 (5th Cir.1985).

The district court did not err in instructing the jury on the law of constructive possession. The issue of constructive possession was suffi-

ciently raised by Martinez and Robinette in their defense to count twelve of the indictment, charging them with possession of methamphetamine with the intent to distribute.

The district court did not err in failing *sua sponte* to declare methamphetamine and phenylacetone to be Schedule III Controlled Substances. *United States v. Daniel,* 813 F.2d 661, 662–64 (5th Cir.1987).

The remarks of Devine's counsel at closing argument that his client waived his fifth amendment privilege did not deprive the other defendants of a fair trial. The statements were intended to bolster Devine's credibility, rather than to attack the co-defendants' decision to remain silent. *United States v. Macker,* 608 F.2d 223, 226 (5th Cir.1979). Moreover, the court's instruction to the jury cured any prejudice resulting from these remarks.

The district court did not abuse its discretion in denying Robinette's oral motion for continuance on the morning of trial. The evidence did not show that Robinette's attorney lacked adequate time to prepare his client's defense.

The district court did not err in imposing a $100,000 fine on Robinette under count one of the indictment. Robinette will be released from prison at the expiration of his term of imprisonment regardless of payment of this fine. *Cf. Williams v. Illinois,* 399 U.S. 235, 90 S.Ct. 2018, 26 L.Ed.2d 586 (1970) (unconstitutional to imprison defendant beyond statutory maximum because of his inability to pay fine).

The district court correctly overruled Robinette's motion to suppress evidence seized during a search of his hotel room. Even if the search warrant lacked probable cause, it was not so facially deficient as to render reliance on the issuing magistrate's probable-cause determination unreasonable. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984).

The district court did not abuse its discretion in denying Barker's motion for mistrial. Any prejudice caused by the witness's unprovoked remarks about Barker's prior criminal record was cured by the court's instruction to the jury. *United States v. Merida,* 765 F.2d 1205, 1220 (5th Cir.1985).